OPINION JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Jamie Seymour, appeals her conviction and sentence in the Richland County Court of Common Pleas, on one count of aggravated murder in violation R.C.2903.01 (B) with a firearm specification and one count of Aggravated Robbery in violation of R.C. 2911.01 (A)(1)), also with a firearm specification. Plaintiff appellee is the State of Ohio.
 {¶ 2} At the beginning of the trial the jury was advised that as a result of an agreement between the parties appellant would not be subject to the death penalty. (T. at 11).
 {¶ 3} Because this is an aggravated murder case, and further, appellant's second assignment of error claims her conviction is against the manifest weight of the evidence, a detailed statement of the facts is warranted.
 {¶ 4} On May 10, 2002, at around 11:30 p.m. Dianne Coleman was driving northbound on Stewart Road in Richland County, Ohio, returning home from the funeral of a friend in Marion, Ohio, which she had left about 10:15 p.m. (T. at 357-58). Shortly after passing Crall Road, she passed a red car coming in the opposite direction and then came upon a man in the road. (T. at 360-61). The man was lying in the road and said he had been shot. She called 911.
 {¶ 5} She asked the man several times who shot him and he responded that he didn't know and then began mumbling unintelligibly. Madison Township paramedics arrived a short time later, around 11:32 p.m., and the police were already on the scene. The squad members loaded up the victim and transported him to MedCentral Hospital within five or six minutes. While examining the victim, squad members asked him who shot him and he responded again, that he did not know. In response to questions from the victim whether he was going to die or not, squad members did not tell him that he was going to die, but rather responded in an encouraging way. Detective Chuck Metcalf, testified that sometimes victims refuse to identify their assailants because they like to take business into their own hands. The victim died between 7:00 a.m. and 8:00 a.m. the next morning at MedCentral Hospital.
 {¶ 6} The police on the scene found what appeared to be relevant evidence in the roadway somewhat less than 100 feet north of the body. In the roadway they found a cell phone, a live round of ammunition, an empty shell casing, and a cigarette butt. An empty shell casing was also found in the ditch line. Detective Chuck Metcalf became the lead detective on the case. He interviewed Dianne Coleman and then became aware of the identity of the victim, Darryl Spencer Cobb. He went to the hospital and found that Mr. Cobb was incoherent, almost comatose. He was unable to obtain any useful information from him, but was able to identify him. Detective Chuck Metcalf then notified Cobb's fiancé that Cobb had been shot. She told him that Mr. Cobb had left her house around 10:50 that evening.
 {¶ 7} The investigation then connected Heather Forwith and a girl named Jamie, last name unknown, with the case. However, the investigation initially focused on Melissa Allie, who is the owner of a red car, and who had connections with the victim. She claimed to have a valid alibi which was investigated and eventually substantiated. At trial, Tammy King confirmed Ms. Allie's alibi. Dominique Robinson also confirmed that Ms. Allie had unsuccessfully tried to call the victim around 11:30 p.m. that evening.
 {¶ 8} The next day, Dr. Dorothy Dean, Deputy Coroner/Forensic Pathologist from the Franklin County Coroner's Office did an autopsy on the victim. She diagnosed that he died from a gunshot wound. She also indicated marijuana was found in the victim's system.
 {¶ 9} Dr. Dean testified that Cobb could have lived anywhere from a few minutes to an hour or more and that he may have been able to walk or run a short distance. Dr. Dean testified on examination of State's Exhibit 4, which was a diagram that included measurements from where the body was found to where the cell phone, shell casings and other evidence were found, that the victim could have moved that distance on his own and remained conscious.
 {¶ 10} Cecil Cottrell testified that he saw the appellant and Heather with the victim four times before May 10, 2002. On each of those occasions, it was to buy marijuana from the victim. Mr. Cottrell confirmed that the victim was to meet Heather at Joe and Mary's Carryout the night of May 10, 2002 in order to get a hotel room with Heather and to supply Heather with marijuana. Mr. Cottrell claimed that the victim was upset when he found out the appellant was with Heather. He further testified that at 10:15 on the night in question, the victim was at his house trying to get more money for drugs and a hotel room.
 {¶ 11} On May 11, 2002, Mr. Cottrell directed detectives to a trailer park in Lakeville where Heather and the appellant lived. Upon arrival at the trailer park, Detective Bob Mack first went to Heather Forwith's trailer. He talked to Heather then went next door to the appellant's trailer. Appellant admitted being in Mansfield the day of the shooting, but said that she had returned to Lakeville between 8:30 and 9:30 p.m. The detective testified that she was nervous and in fact at one time said she had returned to the trailer park at 7:00 p.m.
 {¶ 12} Tina Hively lived with the victim for roughly five years. She testified he bought and sold marijuana, and that he had no car, he had a cell phone, and that he never carried a gun. She testified that on the day of shooting during the day he had between $150 and $200 on him but no drugs. Ms. Hively testified that he had left home with Cecil Cottrell and Rhonda Branham around 9:30 or 10:00 p.m. and came home to get his cell phone charger around 10:50 p.m. He left to find marijuana and he was walking. She didn't see him again until later at the hospital after he was shot.
 {¶ 13} On May 10, 2002, Rhonda Branham and Cecil Cottrell lived together. Ms. Braham testified that she knew the victim sold dope to make a living and that she and Cecil often gave the victim rides. She testified that the appellant and Heather Forwith came to Mansfield to buy marijuana from the victim in the past and that the appellant was always with Heather on those trips. She had known Heather for about a year. Heather and the victim had seen each other off and on and Heather had previously lived in Mansfield.
 {¶ 14} On the evening of May 10, 2002, Rhonda and Cecil dropped the victim off at Joe and Mary's Carryout to meet with Heather Forwith and the appellant. Rhonda Branham identified Heather's car and testified that when the victim approached, Heather was driving and appellant was in the front seat. The appellant got out of the car and into the back seat and the victim got into the front seat.
 {¶ 15} Rhonda saw the appellant again around 10:30 p.m. at her house on Second Street in Mansfield. The victim was with Heather and the appellant and was looking for money. At that time the victim's cell phone was working, but it ran out of power and he left to go home to get his charger around 10:15 or 10:30 p.m. He was still looking for marijuana at that time. He left with Heather and appellant in Heather's car.
 {¶ 16} Melissa Allie testified that she was acquainted with the victim, had a sexual relationship with him, and that she owned a red Chevy Berretta. She also testified that she would have to hide her vehicle from the victim's girlfriend when picking up and dropping off Mr. Cobb. However, she further testified that she broke up with the victim a few days before he was killed. The victim was at Melissa Allie's residence at approximately 9:00 p.m. on the evening of his death. She did not see him with anybody and he spent some time holding her baby. She testified that he left to pick up some "weed". She further testified that after the victim left, she spent time with Tammy King and Dominique Robinson until about 3:00 a.m. The testimony was confirmed by the testimony of King and Robinson.
 {¶ 17} Valerie Billings and Diane Davis both live in the same trailer park as the appellant in Lakeville. Valerie testified that she smoked dope with appellant and her friends. Approximately a week prior to the shooting the appellant did not have money to buy cigarettes. She testified that on the day after the shooting, the appellant had come to her house to borrow rolling papers.
 {¶ 18} Diane Davis testified that she frequently babysat for the appellant's three children. She further testified that she smoked marijuana with Heather Forwith and the appellant. Ms. Davis testified that she would baby-sit the appellant's children while the appellant and Heather went to Mansfield to pickup drugs. On the day of the shooting, Ms. Davis watched the children while Heather and the appellant went to Mansfield. Ms. Davis testified the appellant and Heather left around 5:00 p.m. on May 10, and were suppose to be home by 10:00 p.m. The kids were not picked up at all and in fact Dianne took them home around 10:00 a.m. the next morning. She testified that Heather and Jamie got home between 12:30 a.m. and 1:00 a.m. on May 11. Ms. Davis confirmed that on the day of the shooting, Jamie was broke, but that during the week after the shooting, Jamie and Heather both had drugs.
 {¶ 19} Bobby Smith testified that he had known the victim for a year and a half and that the victim's only source of income was selling marijuana. He testified that he saw the victim, the appellant and Heather Forwith on Burn Street around 10:00 p.m. On May 10 they were in Heather's car, and they were planning on getting a hotel room, getting high and "chilling". He said the victim had a $20 bag of pot on him. Mr. Smith testified that Jamie was acting "* * * nervous, skitso like * * *" (T. at 575). He said the victim was still looking for marijuana and left around 10:15 p.m.
 {¶ 20} Demetrious Rucker testified that on the evening of the shooting, the victim came to him to get marijuana and that he gave him a dime bag. Mr. Rucker also testified that he had previously told police and the prosecutor before trial that he had sold the victim a two ounce bag of marijuana on May 10, 2002, but decided that his dates were wrong.
 {¶ 21} The appellant during her testimony basically admitted to the sequence of events of the previous witnesses. She claimed the last time she saw the victim was when they dropped him off at Joe and Mary's Carryout.
 {¶ 22} Physical and/or technological evidence made up a large part of the evidence presented against the appellant at trial.
 {¶ 23} Detective Medcalf discovered that John Hauser, Jamie Seymour and the victim all had cell phones. Tom Eisenloffel, a frequency engineer for Verizon Wireless, testified at trial. He testified that cell phones constantly register their location. Mr. Eisenloffel provided the jury with a map, State's Exhibit 15, showing the area including Richland County in Mansfield, which map disclosed the location of cell towers and the coverage of the cell towers. Mr. Eisenloffel testified that each cell tower's coverage is divided into three specific pies which are labeled sectors X, Y, and Z. (T. at 444). State's Exhibit 15 also showed the various roads running in the coverage area. Mr. Eisenloffel testified that call detail records are kept of each cell phone call on Verizon's computer. He further testified that call detail records contain information about cell towers and sectors from which calls are made and received for billing purposes. (Id. at 448). He further testified that the cell tower map provided a close depiction of where the cell phone was at the time calls were made and that the location of the call would not vary more than a half mile from the area shown on the State's Exhibit 15 as covered by the particular tower and sector. Mr. Eisenloffel testified from State's Exhibit 17A about a call which originated from appellant's cell phone on May 10, 2002 at 11:31 p.m. He testified from State's Exhibit 15 that this call originated from Site 433Z Sector which included a portion of Stewart Road, the road upon which the victim's body was found. The call was from appellant's phone to the phone of John Hauser. (Id. at 453).
 {¶ 24} Based on Mr. Eisenloffel's testimony Detective Medcalf used State's Exhibit 15 and identified the area of Stewart Road included in the coverage for Site 433Z Sector as including the area of Stewart Road where the victim's body was found. (Tr. at 840-41). He testified the second call that went through the Ashland tower was on a convenient route leading from the murder scene to roads directly leading to the Loudonville/Lakeville area.
 {¶ 25} Captain Joe Daugherty, Director of the Richland County Crime Lab testified that State's Exhibit 8, a cigarette butt, was found in the roadway near the cell phone and the shell casing. (Tr. at 760). Captain Daugherty collected a DNA sample from the appellant.
 {¶ 26} Tony Tambasco, Director of Mansfield Police Department Crime Lab is a qualified DNA expert. He testified that he examined State's Exhibit A, the cigarette butt and concluded from DNA samples that both the victim and the appellant's DNA were on the cigarette butt. (T. at 815).
 {¶ 27} Roiann Brown testified that she had been in jail with the appellant within the last two months before trial. She testified that she overheard the appellant say, "I don't know why I shot him, I was high."
 {¶ 28} Bethany Johnson-Keifer testified that she was a cell mate of the appellant in the Richland County Jail before trial. The appellant made multiple incriminating statements to Johnson-Keifer including he wasn't suppose to get killed, they were just suppose to take pot from him and that both had their hands on the trigger of the gun. (T. at 639-640).
 {¶ 29} Dory Laymen and her husband Brian were friends with the appellant. During a visit at their house in Columbus, Ohio, during the summer of 2002, appellant told Dory that she and her friend Heather had gone to rob a guy and they both had their fingers on the trigger and it went off and he was dead. (Id. at 715-16). Appellant told Dory that John Hauser wanted them to rob the guy. (T. at 716). Brian Laymen testified that "all I know where they-they picked him up from a carry-out. The carry-out was Bob's Joe's, or something. It was the name of the carry-out. I can't remember the name of the carry-out she said. The reason we pressed her about the gun issue is we all said that there is no way you both could have your hands on the gun, tell us what happened. That's when she said she had shot him. That was the first night that we had this conversation." (Tr. at 730). Mr. Layman testified that the appellant confirmed that the victim ran off after he was shot. (Id. 732).
 {¶ 30} Floyd Blackburn was Jamie's brother-in-law married to Tabitha Blackburn, Jamie's sister. As of the trial date he had been separated from Tabitha for six years. He knew Heather through appellant. Mr. Blackburn testified that he was present during the conversation about the shooting with Brian and Dory Layman. Mr. Blackburn testified that the appellant said that she and Heather picked up a guy, plan to rob him of a quarter pound of weed, and she said that both her and Heather's hands were on the gun. (Id. at 684). Mr. Blackburn testified that she went into detail on how the gun was disposed of by John. He further confirmed that the appellant said the victim ran away after he was shot.
 {¶ 31} Tabitha Blackburn, Jamie's sister testified at trial. Tabitha testified that prior to May 2002 she and Jamie stayed in touch and she had in fact visited Jamie in Lakeville. Ms. Blackburn testified that she talked to Jamie approximately three times about the shooting towards the end of May 2002. She said appellant was upset, scared, petrified, and crying. Ms. Blackburn testified that appellant told her that she shot somebody. Ms. Blackburn testified that appellant indicated Heather was with her and that John Hauser had planned it. At one point the police placed a wire on Ms. Blackburn in an attempt to get incriminating evidence against the appellant. This endeavor was unsuccessful.
 {¶ 32} A jury trial commenced on March 17, 2003 and concluded on May 25, 2003. At the conclusion of the trial phase, the appellant was found guilty as charged. As a result of the guilty verdict, the trial proceeded to a sentencing phase.
 {¶ 33} The jury was advised that its sentencing options were life without the possibility of parole, twenty-five years before parole eligibility to life, and thirty years before parole eligibility to life. The jury returned a verdict of thirty years before the possibility of parole to life.
 {¶ 34} The trial court sentenced the appellant to thirty years to life on the aggravated murder charge, ten years on the aggravated robbery charge, to run concurrently with the aggravated murder sentence, and three years on the gun specification to run consecutively with the aggravated murder and aggravated robbery sentences.
 {¶ 35} Appellant timely appealed. Appellant assigns the following two errors to the trial court:
 I {¶ 36} "The trial court's excusal of nine potential jurors prior to the commencement of voir dire because of their status as students denied appellant the right to be tried by a jury of her peers.
 II {¶ 37} "Appellant's conviction was against the manifest weight of the evidence."
 I {¶ 38} In his first assignment of error, appellant contends she was denied a jury of her peers by the trial court's exclusion of college students in violation of R.C. 2313.16. We disagree.
 {¶ 39} R.C. 2313.16 provides "[e]xcept as provided by section2313.13 of the Revised Code, the court of common pleas shall not excuse a person who is liable to serve as a juror and who is drawn and notified, unless it is shown to the satisfaction of the judge by either the juror or another person acquainted with the facts that one or more of the following applies:
 {¶ 40} "(A) The juror is then necessarily absent from the county and will not return in time to serve.
 {¶ 41} "(B) The interests of the public or of the juror will be materially injured by the juror's attendance.
 {¶ 42} "(C) The juror is physically unable to serve.
 {¶ 43} "(D) The juror's spouse or a near relative of the juror or the juror's spouse has recently died or is dangerously ill.
 {¶ 44} "(E) The juror had been called as a juror for trial in a court of record in the county within the same jury year.
 {¶ 45} "(F) The juror is a cloistered member of a religious organization.
 {¶ 46} "When a person who is liable to serve is excused in a case specified in this section, the juror can be excused only by the judge presiding in the case or a representative of the judge. An excuse approved pursuant to this section shall not extend beyond that term. Every approved excuse shall be recorded and filed with the commissioners of jurors."
 {¶ 47} In State v. Strodes (1976), 48 Ohio St.2d 113,357 N.E.2d 375, vacated on other grounds (1978), 438 U.S. 911,98 S.Ct. 3135, 57 L.Ed.2d 1154 the court stated: "[u]nless prejudice to the defendant or the systematic and intentional exclusion of a group is shown, we will not reverse a judgment because of minor and technical defects in jury-selection procedures." Id. at 115-116. See, also State v. Puente (1982),69 Ohio St.2d 136, 137-38, 431 N.E.2d 987, 988-99; Crim. R. 24.
 {¶ 48} In State v. Cornely (1978), 56 Ohio St.2d 1,381 N.E.2d 186, the appellant alleged "that when a trial court dismisses prospective jurors in contradiction to the mandates of R.C. 2313.16 and 2313.17, their dismissal denies a defendant his right to be tried by a jury of his peers." Id. at 3. (Footnotes omitted). The court found in Cornely that the appellant failed to raise the issue in the trial court. Id. However, the court observed that even had the issue been raised in the trial court "appellant's argument is unpersuasive in view of Bond v. State (1872), 23 Ohio St. 349, 355-56. The third paragraph of the syllabus in Bond explains that it is not reversible error for a trial court, prior to the date set for a criminal trial, to discharge jurors on grounds of personal excuse and upon their unsworn statements; nor is it reversible error for the court to refuse to issue attachments against nonattending jurors." Id.
 {¶ 49} In State v. Sells (Sept. 23, 1991), 3rd Dist. No. 8-90-14 the court noted: "[p]ursuant to Ohio Revised Code section2313.16, a person chosen for jury service may be excused from service for specified reasons, on written request, by the presiding judge or his representative. In response to an objection by defense counsel to the array of available jurors, the judge detailed the grounds upon which he had excused some of the jurors. Seven persons had stated that they were absent from the county (two were out-of-state college students), and would not be returning in time for the trial, and one potential juror was too ill to attend. These are valid grounds for excuse, under the statute. R.C. 2113.16(A)-(E)." Id. at *5.
 {¶ 50} In the case at bar, the judge detailed his reasons for excusing the eight (8) students. (T. at 14-17). The trial court found that the students did not reside in Richland County. The court further found that they are attending colleges and universities outside the county. These are valid grounds for excusing the students from jury service.
 {¶ 51} There is nothing in the present record that leads to the conclusion that appellant was either prejudiced by the trial court's failure to follow the requirements of R.C. 2313.16 et seq., or that the jurors who convicted appellant were not qualified jurors.
 {¶ 52} Our analysis does not end with a determination of what the Revised Code requires, for it was also argued that appellant was deprived of his constitutional right to be tried by a jury of his peers.
 {¶ 53} The Sixth Amendment guarantee to a jury trial "contemplates a jury drawn from a fair cross section of the community." Taylor v. Louisiana (1975), 419 U.S. 522, 527,95 S.Ct. 692, 696, 42 L.Ed.2d 690, 696. To establish a violation of this requirement, the "defendant must prove: (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." State v. Fulton (1991),57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus, citingDuren v. Missouri (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668,58 L.Ed.2d 579, 586-587.
 {¶ 54} A criminal defendant has no affirmative right to a jury of a particular racial, gender or age composition. SeeUnited States v. Mack, 159 F.3d 208 (6th Cir. 1998); see alsoTaylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692,42 L.Ed.2d 690 (1975). Neither "young adults" nor "college students" are a "distinct group" cognizable for purposes of the fair cross section requirement. United States v. Maxwell (6th Cir. 1998), 160 F.3d 1071, 1075-76; United States v.Fletcher (9th Cir., 1992), 965 F.2d 781,782; Ford v.Seabold(6th Cir. 1988), 841 F.2d 677, 681-82, cert.denied, 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988). Moreover, appellant's systematic-exclusion claim is based solely on alleged under representation on his venire. But under representation on a single venire is not systematic exclusion.State v. McNeill (1998), 83 Ohio St.3d 438, 444,700 N.E.2d 596.
 {¶ 55} Appellant failed to make the necessary showing under Fulton, Seabold, Duren, and the other authorities mentioned to indicate deliberate exclusion of "distinctive groups" of the jury venire or jury panel involved.
 {¶ 56} Appellant's first assignment of error is overruled
 II {¶ 57} In his second assignment of error, appellant maintains the verdict was against the manifest weight of the evidence.
 {¶ 58} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.
 {¶ 59} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, State v. Thompkins
(1997), 78 Ohio St.3d 387, citations deleted. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment."State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1. Circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991),61 Ohio St.3d 259,574 N.E.2d 492.
 {¶ 60} Appellant does not contend that there was insufficient evidence to prove the essential elements of the crimes charged.State v. Jenks, supra. The only real question in this case is the identity of the person who shot the victim.
 {¶ 61} The State presented evidence that appellant's cell phone was used to place a call at 11:31:14 p.m. on the night of the murder. (T. at 452-53; 839). The call originated from the area where the victim's body was found. (T. at 454-55; 839-40). The State further presented evidence that a cigarette butt found near the scene contained the D.N.A. of both the victim and the appellant. (T. at 760-61; 814-15). Six individuals, including the appellant's sister, brother-in-law and cellmate, testified that appellant had made incriminating statements either to them or in their presence.
 {¶ 62} Upon a thorough review of the record we find there was sufficient, competent evidence to place appellant at the scene of the offense and to establish appellant as the shooter. Based upon the foregoing, we find appellant's convictions were not against the manifest weight of the evidence.
 {¶ 63} Appellant's second assignment of error is overruled.
 {¶ 64} For the foregoing reasons, the judgment of the Richland County Court of Common Pleas, Ohio, is affirmed.
Gwin, P.J., Wise, J., and Edwards, J., concur.
 {¶ 65} For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Richland County Court of Common Pleas, Ohio, is affirmed. Costs to appellant.