[Cite as *State v. Kelly*, 2018-Ohio-378.]

kellyCOURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | Case No. 17 CAA 04 0023 |
| JERMAINE KELLY | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:          Criminal Appeal from the Court of Common
                                 Pleas, Case No.  16 CR I 07 0351


JUDGMENT:                        Affirmed


DATE OF JUDGMENT ENTRY:          January 30, 2018


APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

CAROL HAMILTON O'BRIEN                  WILLIAM T. CRAMER
PROSECUTING ATTORNEY                    470 Olde Worthington Road
DOUGLAS N. DUMOLT                       Suite 200
ASSISTANT PROSECUTOR                    Westerville, Ohio  43082
140 North Sandusky Street, 3rd Floor
Delaware, Ohio  43015

*Wise, J.*

{¶1}   Defendant-Appellant Jermaine Kelly appeals his conviction on two counts of murder entered in the Delaware County Court of Common Pleas following a jury trial.

{¶2}   Plaintiff-Appellee is the State of Ohio.

STATEMENT OF THE CASE

{¶3}   On July 22, 2016, the Delaware County Ohio Grand Jury returned a joint indictment against co-defendants Jermaine Kelly and Reginald Conley. The indictment charged Appellant Kelly with two counts of Murder; Count One in violation of R.C. §2903.02(A) and Count two in violation of R.C. §2903.02(B), both unclassified felonies, Count Three: Intimidation of a Witness, in violation of R.C. §2921.04(B)(2), a third-degree felony, and two counts of Having a Weapon Under Disability in violation of R.C. §2923.13(A)(4).   Counts One, Two, and Three also each carried a Gang Affiliation Specification in violation of R.C. §2941.142 and Firearm Specifications, in violation of R.C. §2941.145.

{¶4}   Prior to trial, the defendants moved to sever their trials. Following an evidentiary hearing, the motions were denied. The trial court also held an evidentiary hearing on the defendants' motions *in limine* to exclude evidence of Conley's involvement in a double homicide with Gervins. Again, the trial court denied the motions.

{¶5}   Appellant waived his right to a jury trial as to the gang specifications related to Counts One, Two, and Three, and his right to a jury trial as to the having weapons under disability charges. Those charges were tried to the court. The murder and intimidation charges along with the firearm specifications were all tried to a jury, with the trial commencing on March 6, 2017 and continuing through March 7, 8, 9 and 10, 2017.

At trial, the jury heard the following account of the events which took place on November 9, 2012, which led to the above charges:

{¶6} Victoria Hilbrands testified that on November 9, 2012, she lived at 6901 Redbank Rd. in Galena, Ohio. Around 5:30 P.M. she heard a loud banging on the door. T. at 254-255. She could not initially see anyone outside the door. However, she heard a man, later identified as Dontee Gervins, yelling that he had been shot and asking to be let in. T. at 256. Mrs. Hilbrands immediately called 911. T. at 257. That call was placed at 5:43 P.M. T. at 284. While on the phone with 911, Mrs. Hilbrands could hear Gervins on his cell phone. Gervins repeatedly said "I won't tell anybody" to the person with whom he was speaking. T. at 260.

{¶7} Gale Dunlap testified that she lived on Gorsuch Rd. This is a short distance from the Hilbrands' residence on Redbank Rd. T. at 346-347. On November 9, 2012 Dunlap was returning home from work sometime after 5:00 P.M. when a vehicle pulled out of the Hilbrands driveway. The vehicle exited the driveway in a manner that forced her to brake her vehicle. T. at 350. She described the vehicle as a light blue or gray sedan but could not identify who was driving or how many occupants were in the vehicle. T. at 351. Mrs. Dunlap was behind the vehicle for a short period of time. During this time, the vehicle failed to stop at two stop signs. T. at 353. Around this same time Mrs. Dunlap saw a squad traveling toward the location where the shooting had occurred. Mrs. Dunlap was unable to positively identify the vehicle but testified it was consistent with that later found to be used by Reginald Conley. T. at 356.

{¶8} Deputy Charm Johnson (also referred to in the record by her maiden name as "Charm Miller") testified that she was the first person to arrive at the Hilbrands'

residence after the shooting. T. at 284-286. She arrived at approximately 5:50 P.M. T. at 299. Dep. Johnson found Gervins laying on the front porch of the Hilbrands' residence. T. at 286. Gervins appeared very weak, indicated he had been shot, but was unable to verbalize his name or other information at that time. T. at 286. Gervins' cellphone was lying next to him on the porch and Dep. Johnson could hear a female voice on the line. T. at 287. Shortly thereafter, Dep. Johnson notified medics that the scene was safe and they could approach to aide Gervins. T. at 288.

{¶9}  Brooks Church testified that he was one of the first medics who arrived at the residence. T. at 326. Church described Gervins as scared, very alert, barely able to speak, but could speak a little in between breaths. T. at 328. Church asked Gervins where the shooting occurred. Gervins responded "here" and gestured as if to indicate near the residence. T. at 330. When asked, Gervins indicated that he knew who shot him. T. at 330.

{¶10} Detective Charles Gannon was the first officer to arrive on scene after Deputy Johnson. He testified he became involved in the investigation at 5:42 P.M. on November 9, 2012. T. at 1190. He was on his way home when the 911 call was placed, but he was the closest detective to 6901 Red Bank Rd. T. at 1190. When Det. Gannon arrived at the scene, medics were working on Mr. Gervins and he was still alive. T. at 1194. Shortly after Det. Gannon arrived, Gervins' cellphone began ringing and "Wifey" was displayed as the caller on the screen of the cell phone. T. at 1200. Det. Gannon had a brief conversation with Amber Bland and ended the call to continue his work on the scene. T. at 202-1203. Det. Gannon finished assisting processing the scene and

documented what occurred. T. at 1203-1212. After his work at the scene was completed, he drove to Riverside hospital. T. at 1217.

{¶11} At the hospital, Det. Gannon learned that Dontee Gervins had been living with his fiancé, Amber Bland, on the near-east side of Columbus, Ohio. T. at 376. Gervins was selling marijuana to pay the bills and was associated with a gang called the Bloods. T. at 377. During this same time frame, Ms. Bland informed him that Gervins and her brother (Richard Bland) were closely associated with a man named Reginald Conley. T. at 378. He learned Conley went by the street name "Twice." T. at 378.

{¶12} Ms. Bland explained that late in the morning on November 9, 2012, Gervins and Ms. Bland ordered pizza and "chilled" at their residence with his friend "Blaze" (later identified as Domino Mack) and Blaze's girlfriend. T. at 379. After they finished eating pizza, Gervins received a phone call and stated that he had to leave but would be back. T. at 380. Before Gervins left, Ms. Bland heard him go into the laundry room and retrieve an unknown quantity of money from a safe in the ceiling. T. at 381-382. Shortly thereafter, Gervins left with Blaze and Blaze's girlfriend. Ms. Bland then fell asleep with her children. T. at 383.

{¶13} Several hours later, Ms. Bland was awoken by a phone call from Gervins. T. at 383. When she answered the phone, he immediately stated "Babe, I've been shot" and hung up the phone. T. at 383. This call was placed at 5:44 P.M. Ms. Bland immediately called him back and had a short conversation with him. Gervins sounded scared and out of breath. T. at 384.

{¶14} When Ms. Bland called him back, Gervins stated that he had been shot and that he was in New Albany. When Ms. Bland asked if he knew who shot him, Gervins

stated that it was "Ice" who shot him and that she was not to tell anyone. She stayed on the phone with him until the paramedics arrived a few minutes later and the phone was hung up. T. at 385.

{¶15} Ms. Bland went to the hospital to be with Gervins and was accompanied by a number of his friends and family. One individual she spoke with at the hospital was "Blaze." T. at 387. Because "Blaze" was the last person she had seen Mr. Gervins with that day, she spoke with him about what had transpired. She then provided that information to Gervins' sister (Dena Bronaugh) and to detectives from the Delaware County Sheriff's Office. T. at 387- 388.

{¶16} Ms. Bland stayed with Mr. Gervins at the hospital most of the week that followed the shooting. During that time he was intubated and unable to breath without the assistance of a tube down his throat. Ultimately, Mr. Gervins succumbed to his injuries on November 18, 2012. T. at 389.

{¶17} Dr. Gerston testified that Gervins was shot in the lower-mid back. The bullet travelled at an upward trajectory perforating the liver and the right lung of Gervins. T. at 472-474. This would have caused continuous internal bleeding, difficulty breathing, and immobility in a matter often to fifteen minutes. T. at 475. Despite efforts to save Gervins' life, he ultimately died as a result of the gunshot wound to the back. T. at 477.

{¶18} In the days immediately after the shooting, Detectives from the Delaware County Sheriff's Office began to make use of the leads provided by Gervins' family at the hospital. Det. Gannon used the contact information provided by Gervins' family and subpoenaed Conley's call detail records for the relevant timeframe. T. at 1219-1220. When he received information that Jermaine Kelly may have been involved in the

shooting, he obtained historical cell phone records for Kelly as well. T. at 1221. Det. Gannon also subpoenaed Gervins' cellphone records.

{¶19} The records identified numerous calls between Conley and Gervins and between Conley and Kelly on the date of the shooting. These records were ultimately given to Det. Moledor for cell phone mapping. T. at 1223. Det. Moledor was able to map the locations of cell phones belonging to Dontee Gervins, Jermaine Kelly, and Reginald Conley around the time Gervins was shot.

{¶20} Generally speaking, all three phones were in the area of the Wilson Market on the near east side of Columbus approximately one hour before the shooting. Between 5:00 P.M. and 5:45 P.M. all three phones can be seen traveling northbound out of Columbus. At 5:33 P.M. Kelly's phone connected to a cell phone tower approximately 2.7 km. from the location of the shooting. That tower would have been the closest to Kelly when the call was made. T. at 981. By approximately 6:00 P.M. Kelly and Conley's phones can both be seen traveling southbound back into the Columbus area. No data from the cell phone mapping was inconsistent with Conley and Kelly being present at the shooting on Redbank Rd. T. at 985.

{¶21} Around the time of Gervins' death, investigators were attempting to identify possible suspects and motive for the shooting. Det. Gannon learned that approximately ten days prior to the shooting, Gervins had been involved in a shooting on Gault St. in Columbus. Det. Gannon obtained records from Columbus Police regarding the Gault Street shooting and learned that Gervins was suspected as being the driver in a robbery that ultimately resulted in the death of two individuals. T. at 1238. The information indicated a man named "Twice" was also involved in the Gault St. shooting. The fact that

both shootings involved someone with the street name "Twice" and Gervins led him to interview Mary Page and Jonathan Dantzler. T. at 1239-1240.

**{¶22}** Mary Page testified that in 2012 she allowed Gervins to sell drugs out of her residence. T. at 732. This residence was across the street from an apartment complex on Gault St. in Columbus, Ohio. T. at 734. Page testified that in the days leading up to the death of Gervins, men identified as "Twice" and "Jesus" (whom she later identified as Jonathan Dantzler) came to her residence with Gervins. T. at 734-736. "Twice" and Dantzler asked Page to knock on the door of a crack dealer she knew in the Gault St. Apartments. The plan was that Conley and Dantzler would then rob the dealer at gunpoint, while Gervins would remain in the car to facilitate their escape. T. at 735, 739-740.

**{¶23}** Page explained that when she, Dantzler, and "Twice" approached the door to the residence, she knocked on the door and inquired of an occupant if she could buy drugs. When she was told no by the occupant, she asked to use the bathroom. T. at 739. When she was told she could not use the bathroom, "Twice" and Dantzler began shooting into the apartment and went inside. Page did not enter the residence and instead fled the scene.

**{¶24}** When Page arrived home, she saw "Twice" and Dantzler get into the car with Gervins and drive off. T. at 740. Page explained that when she saw "Twice" and Gervins later in the day, "Twice" told her not to say anything and told her to implicate two dark skinned guys if questioned about the robbery. T. at 743. At this time, Gervins gave her some drugs. Neither Gervins, Dantzler, nor "Twice" were dark skinned. T. at 744.

**{¶25}** Later that day, Page learned that someone had been killed in the shooting and one person was critically injured. T. at 743. Shortly thereafter, Columbus Police

arrived at her home and arrested her for her involvement in the robbery. She initially told investigators it was two dark-skinned guys who put her up to it, but decided to tell the truth a few moments into her six minute interview. T. at 745. She later identified Gervins as the driver, Dantzler as "Jesus", but did not know who "Twice" was. T. at 756. Page ultimately pled guilty to manslaughter with a firearm specification and testified against Dantzler at his trial. T. at 728-729.

{¶26} Dantzler testified that he was convicted for two counts of homicide arising out of the Gault St. shooting described by Mary Page. T. at 1072. He stated that on the day of the Gault St. shooting, he went to the Gault St. residence in question with Reginald Conley ("Twice"), Gervins, and Page. T. at 1075. Dantzler explained that Gervins drove him, Conley, and Page to the Gault St. residence and that Gervins remained in the car while Page, Conley and he went up to get drugs from the apartment. T. at 1076. Dantzler was arrested a few days after the shooting.

{¶27} On the day Gervins was shot, Dantzler was incarcerated awaiting trial for the Gault St. shootings. T. at 1072. While incarcerated, Dantzler placed a phone call to his brother Jermaine Kelly (who goes by "Mac Maine" and "Maine"). T. at 1069, 1073. On that call, Kelly informed Dantzler that he was "just with Twice." Kelly then stated "I hope we shoot good." Kelly then informed Dantzler that they "shot a little deer." T. at 1168-1169. This call was placed on November 9, 2012 at 6:34 P.M. and occurred less than an hour after Gervins' shooting. In a call to his mother, Kelly acknowledged his participation in this call. T. at 1160.

{¶28} As part of the investigation, investigators attempted to locate the vehicle described by Gale Dunlap. Det. Gannon testified he located a traffic citation issued to

Reginald Conley in August of 2012. The ticket indicated Conley was driving a 2006 Ford Fusion, green in color, with a plate matching the one he borrowed from Christopher Hall. T. at 1232-1233. This prompted detectives to interview Christopher Hall.

**{¶29}** Christopher Hall testified that he knew Reginald Conley as "Reggie Two Times" and "Twice" in mid to late 2012. T. at 531. Hall explained that in 2012, he owned a green Ford Fusion that he had lent to Conley. T. at 532, 536. Conley had possession of the vehicle for at least several weeks. In late 2012, Hall received a phone call that he could retrieve the vehicle. T. at 537. However, Hall was unable to retrieve the vehicle because the Columbus Police impounded it prior to his arrival. T. at 538. This vehicle was later turned over to the Delaware County Sheriff's Office for processing. T. at 566.

**{¶30}** BCI Supervising Agent Gary Wilgus testified he processed the vehicle Hall provided Conley during the timeframe in question. T. at 566. As part of the processing of that vehicle, Agent Wilgus photographed the interior and exterior of the vehicle. T. at 568-.585. Additionally, he attempted to locate the presence of gunshot residue, blood, and latent fingerprints. T. at 571-594. He explained that had a firearm been discharged inside the motor vehicle, there would have been gunshot residue present. T. at 581. Ultimately, no evidence of gunshot residue or blood was located on the vehicle itself. T. at 590-591; 620.

**{¶31}** While no gunshot residue was identified on the vehicle itself, Agent Wilgus documented a blue Champion sweatshirt in the backseat of the vehicle he processed. T. at 571. When the sweatshirt was forensically processed, gunshot residue and the DNA of Reginald Conley were found on it. T. at 637-644; 687-689. Daniel Steiner also testified

that fingerprints lifted by Agent Wilgus from inside the vehicle were left by Conley. T. at 718.

**{¶32}** During the course of the investigation, Reginald Conley made some statements about what occurred in this case. When interviewed by Det. Gannon, he identified himself as "Twice." T. at 1241. He stated that on the date of the shooting, he received a call from Gervins. In response to that call, Conley met up with Gervins at the Wilson Market. He stated Gervins was brought to the market by "Blaze" (Domino Mack); the three waited there for the arrival of Conley's cousin. T. at 1243. After waiting with them for a short time, Conley claimed he walked to his grandma's house a couple blocks away. T. at 1244. Conley stated he had his phone with him all day and that if law enforcement checked the records it would show him at his grandma's house near Wilson Market. T. at 1248.

**{¶33}** In addition to speaking with law enforcement, Conley made statements to Ms. Bland about Gervins' shooting. Ms. Bland testified she saw Conley, whom she also knew as "Twice", on Near Year's Eve of 2012 at an establishment called "The Moonlight." T. at 392. When she saw him, he approached her and they discussed the shooting of Gervins. T. at 395. He stated he was with Mr. Gervins when he went up to Delaware on the day Gervins was shot. He further stated he had a gun on his person at the time Gervins was shot. T. at 395. Ms. Bland identified Mr. Conley in the courtroom as the person she knew as both Reginald Conley and "Twice." T. at 391.

**{¶34}** Conley made additional statements regarding the incident to his cousin Lamonte Rayford. Rayford is also the brother of Amber Bland. Rayford testified he learned that Gervins, his sister's paramour, was shot while Rayford was incarcerated in

Franklin County. T. at 784. He explained his sister, Amber Bland, told him what she knew while he was at the Workhouse in Franklin County. This prompted Rayford to call "Twice" (Reginald Conley) from jail. T. at 787.

**{¶35}** During this call, Rayford discussed with Conley what had transpired with Gervins and the Gault St. shooting for which Dantzler had been arrested. T. at 795. Rayford commented to Conley that he heard Conley was out doing his "thug" too (meaning committing the same offenses as Dantzler). After laughing, Conley stated "they got my name in their mouth" (meaning individuals are accusing him of something). T. at 796-797. When the topic turned to the shooting of Gervins, Conley made some self-aggrandizing comments and then laughed when Rayford suggested Conley had left Gervins for dead. T. at 799.

**{¶36}** Finally, statements were presented that Conley made to fellow inmate Christopher Brookman. Christopher Brookman testified he was incarcerated at the Delaware County Jail with Reginald Conley while both were awaiting disposition of their criminal cases. T. at 921. Brookman explained that on one occasion an inmate "trustee" at the jail had a brief conversation with Conley, which caused Conley to become upset. T. at 923-24. When Brookman questioned Conley about why he was upset, Conley stated he learned someone he knew on the street was going to testify that Conley had admitted to the crime for which he was awaiting trial. T. at 926. Conley then indicated that "he never should have trusted that weak-ass nigger. I shouldn't have never said nothing to him." T. at 927.

**{¶37}** Appellant also presented a number of Kelly's statements at trial. Detective Arthur Kester, III, testified he interviewed Jermaine Kelly on two separate occasions. He

was first interviewed on December 14, 2012. T. at 1153. During the interview Kelly denied knowing anyone by the name of Reginald Conley, "Twice", or "Baby Twice." He further denied knowing an individual by the name of Jonathan Dantzler, "Jesus" or "Baby Jesus." T. at 1155. During the second interview with Kelly, Kelly requested to see the evidence against him. When the Detectives produced a binder and started to go through the evidence Kelly told them to shut the book and left the interview. T. at 1157.

{¶38} Months after Gervins' shooting, Kelly also made statements to Lamonte Rayford regarding Gervins' shooting. Rayford explained he met Kelly after his release from prison and knew him as "Mac Maine." T. at 803. Rayford testified he began to see Kelly daily at the "Taste of Chicago" pizza shop near where they lived. While Rayford described himself as merely an acquaintance of Kelly, he explained his cousin "Meme" (Demetrius Edwards) was very close to Kelly. T. at 806.

{¶39} Rayford explained that on one occasion, Rayford and "Meme" began discussing the Gervins shooting in the presence of Kelly. At that time, Kelly explained that Gervins had to be killed because Gervins was going "to tell on some shit that went down." Kelly explained that he had been the one who shot Gervins. He explained that Gervins was taken to Delaware to go get money, and told he had to switch seats in the car. When Gervins exited the car, Kelly shot him. T. at 807-809.

{¶40} As part of the investigation, law enforcement forensically processed the phones of Conley and Kelly. T. at 1113. The iPhone that was examined was associated with the phone number (614) 316-1329. It contained numerous messages suggesting Jermaine Kelly (Mac Maine) was using the phone in November and December of 2012. This phone was taken from Kelly's person upon his arrest. T. at 1125-1129. The phone

was linked to a "Mac Maine" Facebook page with associated email addressed JermaineKelly82@yahoo.com and MacMaine.3@yahoo.com. Kelly's phone also included contact information for "Baby Twice."

{¶41} Detective Ullom also examined the Blackberry Curve associated with phone number (614) 701-0403 and taken from the person of Reginald Conley. T. at 1134. This phone and corresponding number were provided to law enforcement by Conley during his initial interview. T. at 1246. The data recoverable from the phone was quite limited as it appears that the phone was newly activated on November I8, 2012 at approximately 6:48 P.M. T. at 1136-1137. Det. Gannon testified that Conley activated the cell phone the same day Gervins died. T. at 1247.

{¶42} At trial, Appellee also presented the testimony of Richard Bland. Mr. Bland testified that he was the brother of Lamonte Rayford and Amber Bland. T. at 882. He testified the street name of Reginald Conley was "Twice" and was familiar with Jermaine Kelly being "Mac Maine." T. at 883. He explained that he didn't know Kelly very well, but that Conley was his cousin. T. at 885. He testified that around the time Gervins was shot, Conley was driving a greenish Ford Fusion that had a mirror missing on the passenger side. T. at 888.

{¶43} Appellee presented additional testimony relevant to the gang specification at trial. Lamonte Rayford, a cousin to Reginald Conley, testified he has been a gang member for most of his life in the Columbus area. He explained how individuals typically join a gang. He explained that one can commit a variety of offenses (i.e., sell drugs, rob people, or kill people) or they can be "blessed" into a gang if they have someone in their family with sufficient tenure and rank in the gang. T. at 774. He further explained that

gangs typically have certain geographic territory within the city that can affect which gang individuals in the area join and one's family relationship has some bearing. T. at 775.

{¶44} Based upon where he lived and whom he was related to, Rayford testified he was a "Blood." However, he commonly associated with "Crips" who he knew to engage in robberies, drug transactions, and other illicit acts. T. at 776. In 2012, Rayford was associated with the "ATM Crips" ("Anytime Money Crips"); other members included "Twice" (Reginald Conley), "Meme" (Demetrius Edwards), "Van" (Conley's brother), and several others. The purpose of this gang was to get money by any means necessary. T. at 777-778. Reginald Conley had "ATM" tattooed on his body to identify himself as a member of this gang. T. at 779.

{¶45} Outside the presence of the jury, Rayford explained that back in 2012 he and Conley would consume and sell marijuana, codeine, methazine, pills, and powders together. T. at 867. He explained that they got money for drugs by "hustling" (selling drugs) and "robbing." T. at 868. On a number of occasions, he saw Conley sell drugs. T. at 868. Hall also testified Conley sold drugs to support his own habit. T. at 554:1-3. Rayford testified he committed a number of robberies with Conley in 2012. T. at 870. When asked for the names of specific stores they robbed together, he indicated he would rather not answer that question.

{¶46} Outside the presence of the jury, Dantzler explained that he was from Trevitt Heights, and the gang that controls that area is called the Crips. T. at 1085. He explained that he was a Crip and that there were certain colors and signals associated with the gang. T. at 1087. Dantzler explained that he would sell crack cocaine around his part of

the city to make ends meet. T. at 1088. He explained that he also identified as an "ATM Crip." T. at 1090.

**{¶47}** At the close of the state's case, the prosecution voluntarily dismissed one of Kelly's weapon-under-disability charges, while the court dismissed Conley's weapon-under-disability charge pursuant to Crim.R. 29. The defendants were found guilty of all the remaining charges and specifications.

**{¶48}** At sentencing, the court sentenced both defendants to a mandatory term of fifteen years to life for the first count of murder, plus six years mandatory consecutive time for the firearm use and criminal gang specifications. The other counts were merged into the murder pursuant to R.C. §2941.25. Additionally, as to Kelly, the court imposed a concurrent term of thirty-six months on the weapon-under-disability count. The aggregate prison term for both defendants was twenty-one years to life.

**{¶49}** Appellant Kelly now appeals, assigning the following errors for review:

ASSIGNMENTS OF ERROR

**{¶50}** "I. THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL AND CRIM.R. 14 BY DENYING APPELLANT'S MOTION TO SEVER HIS TRIAL FROM THAT OF CODEFENDANT.

**{¶51}** "II. APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO RENEW THE SEVERANCE ARGUMENT.

**{¶52}** "III. APPELLANT'S CONVICTIONS FOR MURDER, INTIMIDATION, AND HAVING A WEAPON UNDER DISABILITY, AND THE SPECIFICATIONS FOR

FIREARM USE, VIOLATE APPELLANT'S DUE PROCESS RIGHTS BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶53} "IV. APPELLANT'S CONVICTIONS FOR MURDER, INTIMIDATION, AND HAVING WEAPONS UNDER DISABILITY, AND THE FIREARM SPECIFICATIONS, ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶54} "V. APPELLANT'S GUILTY FINDINGS ON THE CRIMINAL GANG SPECIFICATIONS VIOLATED DUE PROCESS BECAUSE THEY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶55} "VI. APPELLANT'S GUILTY FINDINGS ON THE CRIMINAL GANG SPECIFICATIONS ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

I.

{¶56} In his First Assignments of Error, Appellant argues that the trial court erred in denying his motion to sever his trial from his co-defendant. We disagree.

{¶57} Defendants may be charged in the same indictment, pursuant to Ohio Crim. R. 8(B) as follows:

{¶58} Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

{¶59} The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of

multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. *State v. Thomas*, 61 Ohio St.2d 223, 400 N.E.2d 401 (1980).

**{¶60}** In order to obtain a severance, a defendant needed to affirmatively demonstrate prejudice by the joinder. Crim.R. 14.

**{¶61}** Criminal Rule 14 provides, in pertinent part:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, information or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

**{¶62}** The United States Supreme Court has stated, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, (122 L.Ed.2d 317 1993). Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* Indeed, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States*

*v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987). Thus, to prevail on his severance argument, an appellant must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Saadey,* 393 F.3d 669, 678 (6th Cir 2005), *United States v. Driver,* 535 F.3d 424, 427 (6th Cir. 2008).

**{¶63}** When a defendant makes a pretrial Crim.R. 14 motion to sever, he is required to renew the motion at the close of the state's case or the conclusion of all the evidence so that the trial court can conduct a Crim.R. 14 analysis based on all of the evidence presented at trial. *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, ¶ 34. Failure to renew the motion forfeits all but plain error on appeal. *Id.*; and *see State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23 (an appellant forfeits an error by failing to preserve an objection, but forfeiture does not extinguish a claim of plain error under Crim.R. 52(B).)

**{¶64}** We generally review a trial court's decision on a motion to sever for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. But when the appellant forfeits an issue we review only for plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 62. Here, Reynolds's trial counsel failed to renew his motion to sever after the state presented its case or at the close of the evidence. Thus, he has forfeited all but plain error.

**{¶65}** Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d

91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is not present unless the outcome of the trial would have been different but for the complained of error. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78.

**{¶66}** Upon review, we find that the trial court did not err in denying the motion to sever as the evidence against both defendants was similar. The cell phone record evidence placed both defendants together with Gervins in the vicinity at the time the victim was shot. Phone records were also produced showing that Conley called Kelly after he set up the meeting with Gervins. Both defendants also had the same motive to silence Gervins; to keep him from identifying Conley (Kelly's cousin) as one of the shooters in the Gault Street shooting and from testifying against Dantzler (Kelly's brother).

**{¶67}** Thus, joinder was proper, and the trial court did not commit any error, let alone plain error, when it denied Appellant's motion to sever.

**{¶68}** Appellant's First Assignment of Error is overruled.

**II.**

**{¶69}** In his Second Assignment of Error, Appellant argues that he was denied the effective assistance of counsel. We disagree.

**{¶70}** More specifically, Appellant argues that his counsel was ineffective in failing to renew the severance argument.

**{¶71}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122

L.Ed.2d 180( 1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 ( 1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373( 1989).

**{¶72}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley*. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

**{¶73}** The United States Supreme Court discussed the prejudice prong of the *Strickland* test:

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S.Ct. 2052.

Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel's

representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

**{¶74}** *Harrington v. Richter*, 562 U.S. 86, 104–105, 131 S.Ct. 770, 777–778, 178 L.Ed.2d 624 (2011).

**{¶75}** The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d 373, *quoting Strickland,* 466 U.S. at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶76}** Upon review, and based on our disposition of Assignment of Error I finding that joinder was proper in this matter and that Appellant was not prejudiced by same, we find Appellant has failed in his burden to demonstrate a reasonable probability that, but for counsel's failure to renew the motion to sever, the result of the proceeding would have been different.

**{¶77}** Appellant's Second Assignment of Error is overruled.

**III., IV.**

**{¶78}** In his Third and Fourth Assignments of Error, Appellant argues that his convictions were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶79}** On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also, State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶80}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and

credibility of each witness, something that does not translate well on the written page."

*Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

**{¶81}** Appellant was convicted of murder, in violation of R.C. §2903.02(A), which states:

> (A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

**{¶82}** Appellant was also convicted of intimidation, in violation of R.C. §2921.04(B)(2), having weapons while under disability and firearm specifications.

**{¶83}** Upon review, we find that while Appellant does state in his Assignment of Error that he is challenging these convictions, he does not address these convictions separately in his argument. Pursuant to App.R. 12(A)(2), this Court may disregard an assignment of error if the party raising it fails to argue the assignment separately in his or her brief, as required by App.R. 16. This Court has no duty to rule on assignments of error that are not adequately briefed. *In re Brow*n (1989), 60 Ohio App.3d 136, 139, 573 N.E.2d 1217; *North Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 476 N.E.2d 388; *also see Newburgh Heights v. Wheatley* (Oct. 29, 1998), Cuyahoga App. No. 72422, unreported. We therefore decline, in the absence of any argument or citation to legal authority, to address Appellant's challenge to his convictions on the intimidation, having weapons while under disability and firearm specification counts other than as they relate to his murder conviction.

**{¶84}** Appellant, in the case *sub judice*, argues that the only evidence against him were the cell phone records indicating that his phone was in the vicinity of the shooting

when it occurred and his jail telephone call with Dantzler.  Appellant argues that his alleged statements to Rayford admitting that he killed Gervins were fabrications.

**{¶85}** Upon review, this Court finds based on the testimony and evidence presented at trial as set forth above, that the State presented proof beyond a reasonable doubt that Appellant was guilty of the murder of Dontee Gervins.

**{¶86}** The jury heard testimony from Lamonte Rayford that Appellant admitted to him that he was involved in Gervins' murder. Further, evidence was presented as to cell phone tower data which placed Appellant, his co-defendant Conley and Gervins together in Delaware County.  There was also ample evidence presented that Gervins was the only witness to the Gault Street shootings who could have testified against Jonathan Dantzler, who was in jail awaiting trial, and who could identify and inform the police that Appellant was also involved those shootings.  Appellant also received a call from Dantzler, who is Appellant's brother, from the jail less than an hour after Gervins was shot. During this call Appellant informed his brother that he was "just with Twice" and that they "got a little deer" and that he "hope they shoot good." (T. at 1168-1169).

**{¶87}** The jury also heard ample evidence as to motive in this case.  As stated above, Gervins could identify co-defendant Conley, Appellant's cousin, as one of the shootings in the Gault Street crimes and could testify against Dantzler, Appellant's brother.

**{¶88}** The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the

evidence." *State v. McGregor,* 5th Dist. Ashland No. 15–COA–023, 2016–Ohio–3082, 2016 WL 2942992, ¶ 10, citing *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 2000 WL 297252 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.* Our review of the entire record reveals no significant inconsistencies or other conflicts in the State's evidence which would demonstrate a lack of credibility of the witnesses sufficient to find the jury lost its way to finding Appellant guilty.

**{¶89}** Based on the foregoing, together with all of the evidence presented, we find that Appellant's murder conviction was supported by sufficient evidence and that the jury did not lose its way in finding Appellant guilty beyond a reasonable doubt.

**{¶90}** Appellant's Third and Fourth Assignments of Error are overruled.

### V., VI.

**{¶91}** In his Fifth and Sixth Assignments of Error, Appellant argues that his convictions on the criminal gang specifications were against the manifest weight and sufficiency of the evidence.

**{¶92}** A gang specification under R.C. §2941.142 mandates a prison term of one, two, or three years on an offender who commits a felony "that is an offense of violence while participating in a criminal gang."

**{¶93}** Regarding the existence of a criminal gang requirement of the gang specification, the state must prove that the "persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity." R.C. 2923.41(A)(3). *See State v. Johnson*, 10th Dist. No. 07AP-538, 2008-Ohio-590, 2008 WL 384231, ¶41 (vacating the appellant's conviction on gang specification

because of insufficient evidence for jury to find pattern of criminal gang activity due to absence of testimony that members of the appellant's gang committed any of the type of crimes listed in R.C. 2923.41(B)(1)); *State v. Bickerstaff*, 7th Dist. No. 09 JE 33, 2011-Ohio-1345, 2011 WL 1004925, ¶58–60 (finding sufficient evidence to establish pattern of criminal gang activity based on police detective and gang member testimony outlining the felony offenses committed by members of the appellant's gang). Further, the state must demonstrate the offense of violence was committed while participating in that criminal gang. *See State v. Smith*, 6th Dist. No. L-15-1027, 2017-Ohio-776, 2017 WL 837080, ¶ 49–50 (finding sufficient evidence to support conclusion that the offenses were committed while the appellant participated in a criminal gang based on testimony regarding local gang culture, the appellant's affiliation with a criminal gang, and the connection between violence and gang status); *State v. Yates*, 8th Dist. No. 96774, 2012-Ohio-919, 2012 WL 759201, ¶ 22 (finding sufficient evidence that shooting was related to gang activity where the appellant and other criminal gang members were "patrolling their territory" in a vehicle when "they came upon the [pedestrian] victims" and the appellant "exchanged words" with one of the pedestrians before shooting). Thus, gang-related testimony is not only relevant but necessary for the state to prove a gang specification.

{¶94} In the instant case, to prove the gang specification, the state needed to show that Appellant committed the murder "while participating in a criminal gang." *See* R.C. §2941.142. Here, evidence demonstrated that Jonathan Dantzler, Richard Bland, Reginald Conley and Lamonte Rayford were members of a gang known as the "ATM Crips" and that such gang is a criminal gang. Conley and Dantzler both have ATM Crips tattoos. Appellant is the brother of Dantzler and cousin of Conley. The jury found Appellant

complicit in the murder of Gervins. Testimony was presented that Gervin's murder was committed to prevent him from testifying against Conley and Dantzler for their roles in the Gault Street shootings.

{¶95} Collectively, evidence of the above facts reasonably demonstrates that Appellant committed or was complicit in the act of murder, at least in part, for the purpose of assisting and/or furthering the interests of a criminal gang. Therefore, sufficient evidence was presented at trial for the jury to find that the shooting occurred while Appellant was participating in a criminal gang.

{¶96} For these reasons, we find that sufficient evidence supported Appellant's criminal gang specification convictions, and his convictions were not against the manifest weight of the evidence.

{¶97} Accordingly, we overrule Appellant's Fifth and Sixth Assignments of Error.

{¶98} For the foregoing reasons, the judgment of the Court of Common Pleas of Delaware County, Ohio, is affirmed.

By: Wise, J.

Delaney, P. J., and

Baldwin, J., concur.

JWW/d 0122