[Cite as *State v. Cable*, 2018-Ohio-3923.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-23 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-510 |
| | : | |
| MICHAEL A. CABLE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of September, 2018.

. . . . . . . . . . .

JANNA L. PARKER, Atty. Reg. No. 0075261, 201 W. Main Street, Troy, Ohio 45373
    Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 E. Stroop Road, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Michael Cable appeals from his convictions for aggravated burglary and aggravated robbery. He contends that the trial court erred by not providing him the assistance of a DNA expert at state expense. He further contends the trial court erred by failing to merge the convictions. Finally, Cable contends that the convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 2} We conclude that none of Cable's contentions have merit, and we affirm the trial court's judgment.

### I. Facts and Procedural History

{¶ 3} This case arises from a break-in at a Piqua apartment. Around 3 a.m. on October 28, 2014, two men forced their way into the apartment while the residents, Ryan and Mackenzie, were home. The men's faces were covered, they wore baggy clothing, and they had duct tape wrapped around their fingers. The men had guns and demanded money, drugs, and phones. One of the men hit Ryan in the head with a pistol, causing a laceration. Later, the same man sliced open Ryan's chest with a box cutter. Neither victim could identify either man. Police found two pieces of duct tape in Ryan's room. DNA testing found Cable's DNA on the sticky side of one of the pieces of tape.

{¶ 4} Cable was indicted in September 2016 on charges of aggravated robbery, in violation of R.C. 2911.01(A)(3), and aggravated burglary, in violation of R.C. 2911.11(A)(1), both first-degree felonies.[1] Cable filed a motion to suppress and a motion

---

[1] Cable was initially indicted on September 28, 2015, on charges of aggravated robbery, aggravated burglary, and felonious assault. The State dismissed that case without prejudice on October 27, 2015, pending test results from the Miami Valley Regional Crime Lab.

to retest the DNA evidence from the piece of duct tape. In the motion to retest, he asked the trial court to appoint an independent DNA expert to test the duct tape, on the ground that "the DNA evidence found at the scene and allegedly matched to the Defendant is the only evidence linking the Defendant to this crime scene." After the trial court overruled the motion to suppress, Cable filed a supplemental motion to retest. The trial court overruled the motion to retest in February 2017, concluding that Cable had failed to show a particularized need for a DNA expert.

{¶ 5} Cable then filed a motion asking the trial court to reconsider its decision denying the motion to retest. The court held a hearing at which the State presented testimony from the police officers who collected the pieces of duct tape and the forensic scientists at the Miami Valley Regional Crime Lab who tested them. Concluding that Cable had still not shown a particularized need for a court-appointed DNA expert, the trial court denied the motion to reconsider.

{¶ 6} A superseding indictment added a repeat violent offender specification to each charge in the original indictment. The two charges and specifications were tried to a jury. The jury found Cable guilty of them all. The trial court declined to merge the aggravated burglary and aggravated robbery offenses and sentenced Cable to a total of 26 years in prison.

{¶ 7} Cable appeals.

## II. Analysis

{¶ 8} Cable presents three assignments of error for our review. The first assignment of error argues that the trial court should have appointed a DNA expert to assist the defense. The second assignment of error argues that the court should have

merged the aggravated burglary and aggravated robbery offenses. The third assignment of error argues that the convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

### A. DNA expert at state expense

{¶ 9} The first assignment of error alleges:

THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY DENYING HIS MOTION FOR FUNDS TO OBTAIN A DNA EXPERT AT STATE EXPENSE.

{¶ 10} Constitutional due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *State v. Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932 (1998), syllabus. In making this determination, the court must consider "(1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided." *Id.* at 149.

{¶ 11} To establish a due process violation, " ' "a defendant must show a reasonable probability that an expert would aid in his defense, and that denial of expert

assistance would result in an unfair trial." ' " *Id.*, quoting *State v. Broom*, 40 Ohio St.3d 277, 283, 533 N.E.2d 682 (1988), quoting *Little v. Armontrout*, 835 F.2d 1240, 1244 (8th Cir.1987). The mere possibility that an expert could have had some value to the defense is not enough. *State v. Campbell*, 90 Ohio St.3d 320, 328, 738 N.E.2d 1178 (2000).

{¶ 12} Cable asked the trial court to appoint an "independent examiner to review the tests performed by the Miami Valley Regional Crime Lab and their result, and, if necessary, be permitted to perform his or her own tests to determine the validity of the Crime Lab's findings." Cable argued that this was important because the DNA evidence was the only evidence linking him to the crimes. Cable provided the trial court with the name and cost of a potential DNA expert, who would perform a case review, help the defense understand the crime lab's DNA test results, and determine if the results were supported by the underlying data. The cost for the potential expert's "Case Consultation/Review" was listed as $295/hour, with a five hour minimum, and a review "usually" required 5-10 hours, or $1,475 to $2,950. Additionally, expert testimony cost "$295/hour or $1,800/day + expenses," and DNA testing of evidence and a known reference cost "$995."

{¶ 13} Cable asserted in his motion to reconsider a number of potential procedural problems with the collection and testing of the DNA evidence. He noted that the crime scene was not secured before the duct tape was found. He also noted that the two pieces of duct tape were submitted to the crime lab for testing and that several lab reports were issued on different dates addressing different test results. Finally, Cable noted that the piece of duct tape on which his DNA was found had been returned to the Piqua Police Department and then resubmitted to the crime lab for additional testing.

{¶ 14} The trial court denied the motion, as well as the motion to reconsider its denial, because it concluded that Cable had failed to make a particularized showing of need. The court found that Cable had not given a specific reason why he needed expert assistance. He had asserted only that an expert "could assist" the defense but failed to give a reason to think that an independent DNA analysis would be more than merely cumulative. "The mere possibility that independent DNA analysis could have some value to the defense," said the trial court, "is not enough."

{¶ 15} The evidentiary hearing on the motion to reconsider featured extensive and comprehensive testimony on the collection, handling, and testing of the duct tape pieces from the police officers who found the tape, Todd Voskuhl and Jeremy Weber, and from the two forensic scientists at the Miami Valley Regional Crime Lab who tested the tape, Jennifer Yoak, a latent fingerprint examiner, and Amy Dallaire, a forensic chemist in DNA and serology.

{¶ 16} Officer Voskuhl testified that he responded to the scene around 3:12 a.m., where he talked to the victims and took photographs. Voskuhl left the scene but was later told by another officer that the victims had reported that the suspects were wearing duct tape on their fingers. So Voskuhl returned and found a piece of rolled duct tape on an air mattress in Ryan's bedroom. Officer Voskuhl collected the piece of duct tape, packaged it, sealed it, signed his initials over the seal, and placed it in an evidence locker in the police department's property room. He also completed a Miami Valley Crime Lab submission sheet. On the sheet, he listed the rolled piece of duct tape and wrote the analysis codes for latent-fingerprint processing and serology/DNA. In the space for a case-history narrative, Voskuhl wrote: "Suspect was wearing duct tape on fingers during

the crime. Please process for fingerprints and/or DNA for a possible suspect match." He placed the lab submission sheet in a file tray where the property custodian, who was responsible for actually submitting the evidence to the crime lab, would retrieve it. Officer Voskuhl said that someone—he didn't know who—later modified the lab submission sheet by listing another piece of evidence, identified as "Piece of duct tape," and writing an analysis code for serology/DNA.

{¶ 17} Next, Officer Weber testified that he had been a detective with the Piqua Police Department and was tasked with following up on the investigation. He visited the scene around 10:30 a.m. on the day of the crime, where he met with one of the victims, Mackenzie, and viewed the crime scene. On the floor of Ryan's bedroom, Weber found another piece of duct tape, which, Mackenzie told him, had been on the bed until Ryan put it on the floor. Officer Weber collected the piece of duct tape, placed it in an envelope and, when he returned to the police station, packaged and sealed the tape. He also completed a lab submission sheet requesting that the duct tape be tested for DNA, but his lab submission sheet was never sent to the crime lab. Instead, Weber's test request was added to Officer Voskuhl's lab submission sheet. That lab submission sheet and the two pieces of duct tape were submitted to the crime lab on November 4, 2014, by Chief Deputy Tom Christy, the property custodian at the time.

{¶ 18} Several months later, in March 2015, Officer Weber called the crime lab and asked a serologist what tests had been done on the duct tape and what other tests could be done to identify a suspect. It seems that the inside of the piece he collected had not been tested, so Weber resubmitted that piece of duct tape so that the inside (the sticky side) could be tested for the presence of DNA. Officer Weber made it clear in his

testimony that only two pieces of duct tape were ever collected from the crime scene, one by him and one by Officer Voskuhl.

{¶ 19} Latent fingerprint examiner Jennifer Yoak then testified that she looked for fingerprints on the piece of rolled duct tape, which the lab referred to as submission 1, the piece collected by Officer Voskuhl. Yoak also testified about the crime lab's internal chain-of-custody report for submission 1, which showed exactly where and in whose custody the evidence was at all times. She further testified about the testing protocol. Yoak explained that an item submitted for both DNA and fingerprint testing is taken into the custody of the latent-fingerprint section. But to avoid cross-contamination from the fingerprint test, a DNA analyst first swabs the item to get samples for DNA and serological tests. Yoak also testified that the lab follows the analysis codes written on the lab submission sheet, not what is written in the case-history narrative. She said the analysis codes written on the lab submission sheet in this case showed that submission 1 was to be tested for fingerprints and DNA and that submission 2, the piece of duct tape collected by Officer Weber, was to be tested only for DNA. Yoak said that she never saw or took custody of submission 2.

{¶ 20} The last witness was Amy Dallaire, who testified that she had worked at the crime lab as a forensic scientist in DNA/serology for over 14 years. She talked about the secure transfer of evidence inside the lab and the chain-of-custody reports. Dallaire explained that any time an item of evidence is moved, it is scanned out of one location and then into another location by the person taking custody of the item. She said that the chain-of-custody report for submission 1 (the piece of rolled duct tape found by Officer Voskuhl) showed that her department initially took custody of it from Tom Christy of the

Piqua Police Department. Dallaire said that no DNA test was performed on submission 1. Rather, as the report shows, it was transferred to the latent-fingerprint section for processing. There, she said, a DNA/serology analyst obtained test samples before the latent-print examination, to avoid cross-contamination. Dallaire said that submission 1 tested presumptively positive for blood and that no further DNA/serological test was performed on it.

{¶ 21} As for submission 2 (the piece of duct tape found by Officer Weber), Dallaire testified that the chain-of-custody report showed that it was submitted by Tom Christy at the same time as submission 1 was submitted. Submission 2 was placed in the outer property room and then retrieved by a DNA/serology analyst and placed in the serology property room. Dallaire said that she took custody of submission 2 and tested it. On the outside of the piece of duct tape, she observed red-brown staining, which she tested for the presumptive presence of blood and DNA. It was blood, and Dallaire determined that the blood on the outside of the tape was from Ryan. Dallaire returned submission 2 to the serology property room the same day. A few days later, it was returned to the Piqua Police Department, according to the usual practice of the crime lab. Dallaire said that submission 2 never went to the latent-fingerprint section, because according to the lab submission sheet, only DNA testing was requested for the item. Later, in April 2015, submission 2 was resubmitted so that the inside (the sticky side) of the duct tape could be tested for touch DNA. Dallaire put the major component of the DNA she found from the inside of the tape into the CODIS database, which led to Cable's identity. Later, a DNA standard from Michael Cable was obtained, which she tested; that test result showed that the DNA on the tape was that of Cable.

{¶ 22} Dallaire further testified about how she performed the tests on submission 2. She talked about the different machines that conducted the DNA tests—how they work and how they are calibrated, cleaned, and certified to ensure accurate testing. She said that all the machines were in proper working order during the testing done in this case. Dallaire also talked about the efforts that the lab makes to prevent cross-contamination.

{¶ 23} The hearing focused on the chain of custody of the two pieces of duct tape, what tests were conducted on each piece and why, and the timing of the tests and results. Defense counsel never asked Dallaire about the actual DNA-test results, the data that she collected and analyzed, or her conclusion that the DNA found on submission 2 (the piece of duct tape found by Officer Weber) came from Cable. In the end, the trial court denied Cable's request for a DNA expert, saying that "[t]here was nothing presented at the hearing which would demonstrate that the defendant has a particularized need for a court appointed DNA expert."

{¶ 24} Cable argues that certain aspects of the physical evidence collection and handling raised issues in how the DNA evidence was collected and tested. He says that he demonstrated a "reasonable probability" that a DNA expert "would aid in his defense." He says that he needed an independent DNA expert to assess the strength of the DNA evidence. In his argument, Cable makes much of the fact that the DNA evidence was the only evidence that linked him to the crime. However, even if only a single piece of evidence links the defendant to a crime, before ordering the state to pay for expert review, the law still requires the defendant to make a "particularized showing," which requires showing more than the mere possibility that an expert could help the defense. Presenting the trial court with nothing more than speculation as to the likely value of an expert does

not amount to a "particularized showing." *Campbell*, 90 Ohio St.3d at 328, 738 N.E.2d 1178. As the Eighth District has said about DNA evidence: "That there could possibly be errors in forensic science is a truism, not a demonstration of a particularized need for an independent forensic expert." *State v. Dennis*, 2017-Ohio-4437, 93 N.E.3d 277, ¶ 19 (8th Dist.). If the mere possibility of error were enough, "all defendants would be entitled to their own forensic experts in every case involving DNA evidence." *Id.* at ¶ 20.

**{¶ 25}** Cable's arguments here are all speculative. We see nothing in the record that suggests anything improper in the collection, handling, or testing of the piece of duct tape bearing Cable's DNA. There is also nothing in the record to indicate that prior to the DNA hit the police had any idea of Cable's identity. Because his identity was unknown and there is no evidence of any possibility of contamination of the evidence with some unknown person's DNA, one can only conclude that Cable was wearing that piece of tape on a finger at the time of the offense, when it was left at the apartment.[2] Given these facts, the trial court could reasonably have found that Cable failed to make a "particularized showing" that a DNA expert would aid his defense and that an unfair trial would result without such an expert. Consequently, we cannot conclude that the trial court's decision in this case not to appoint an expert was an abuse of discretion.

**{¶ 26}** The first assignment of error is overruled.

### B. Merger

**{¶ 27}** The second assignment of error alleges:

THE TRIAL COURT ERRED BY CONVICTING APPELLANT OF ALLIED

---

[2] Mackenzie testified that Cable had never been to her apartment. Ryan testified that Cable was a total stranger to him.

OFFENSES OF SIMILAR IMPORT.

**{¶ 28}** Cable argues that his offenses of aggravated robbery and aggravated burglary should merge for sentencing purposes under R.C. 2941.25.

**{¶ 29}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Article I, Section 10, of the Ohio Constitution prohibit multiple punishments for the same offense. This prohibition is codified in R.C. 2941.25:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"R.C. 2941.25 focuses on the defendant's conduct." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26. "In other words, how were the offenses committed?" *Id.* at ¶ 25. If the offenses were committed in any of the following ways, the offenses are not allied offenses of similar import, meaning that "the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id.* The merger test, then, considers the

conduct, the animus, and the import. *See id.* at ¶ 31.

{¶ 30} "An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Hazley*, 2d Dist. Montgomery No. 27107, 2016-Ohio-7689, ¶ 16, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *Williams* at ¶ 28.

{¶ 31} Cable was convicted of aggravated burglary under R.C. 2911.11(A)(1), which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * *:
>
> > (1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

He was also convicted of aggravated robbery under R.C. 2911.01(A)(3), which provides:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * *:
>
> > * * *
>
> > (3) Inflict, or attempt to inflict, serious physical harm on another.

"Physical harm to persons" is statutorily defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). The

statutory definition of "serious physical harm to persons" includes "[a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement" and "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(d) and (e).

{¶ 32} The trial court here declined to merge the aggravated burglary and aggravated robbery offenses because it found that separate conduct caused separate harm. The court found that when Cable struck Ryan with the pistol, he satisfied aggravated burglary's physical-harm element, completing the offense; later, when Cable sliced open Ryan's chest with a box cutter, he satisfied aggravated robbery's serious-physical-harm element, completing that offense.

{¶ 33} We agree with the trial court's analysis and conclusion. A photograph in the record establishes that the head wound that Cable gave Ryan by pistol whipping him constituted "physical harm." Further, photographs and testimony leave little doubt that the chest wound that Cable gave Ryan with the box cutter—several inches long, down to the bone—satisfied the definition of "serious physical harm." Under the facts of this case, then, aggravated burglary and aggravated robbery were not allied offenses of similar import, because each offense involved separate conduct that caused separate, identifiable harm.

{¶ 34} The second assignment of error is overruled.

### C. Sufficiency and weight of the evidence

{¶ 35} The third assignment of error alleges:

APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT

EVIDENCE TO PROVE GUILT BEYOND A REASONABLE DOUBT AND

ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 36}** Cable's evidentiary challenges here focus on the fact that the only evidence linking him to the crimes was the result of the DNA test performed on the piece of duct tape found at the scene.

**{¶ 37}** "When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶ 19, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus.

**{¶ 38}** "By contrast, to evaluate a manifest-weight claim, a court must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. The court must decide whether ' "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." ' " (Citation omitted.) *State v. Beasley*, 2018-Ohio-493, __N.E.3d__, ¶ 208, quoting *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 328, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 39}** The victims, Ryan and Mackenzie, both testified at trial. They were roommates and friends living together in a two-bedroom apartment on the first floor of a

building in Piqua. At the time, Ryan was selling heroin to earn money, and Mackenzie was earning money as a prostitute. Around 3 a.m., on October 28, 2014, Ryan was in his room alone, lying awake on his bed, and Mackenzie was in her room with a "client." Mackenzie testified that she heard a noise and then a white male wearing dark, baggy clothing and a bandana covering all but his eyes and holding a gun entered her room and demanded her and her client's phones. Ryan testified that he heard two loud thuds and then saw a white male burst into his room holding a pistol and wearing a hat, a long-sleeved hoodie, and baggy clothing with a bandana on his face covering all but his eyes. Duct tape covered the man's hands. The man rushed over to Ryan and tried to hold him down on the bed. Ryan struggled, and the man struck Ryan's head with the pistol, causing a bleeding laceration. The man angrily demanded Ryan's phone, money, and drugs. As the two struggled, the other assailant entered the room with Mackenzie and her client. The man struggling with Ryan then pulled out a box cutter and started slashing at Ryan. The third slash caught Ryan's chest, slicing right through his left pectoral muscle. Ryan testified that he looked down and saw "his skin opened up." The two assailants then fled, taking with them some drug capsules and Ryan's phone.

{¶ 40} Mackenzie identified in photographs duct tape left at the crime scene, blood, and the injury to Ryan's head. She testified that she knew Cable as an acquaintance who dated one of her friends, but that she had no disputes with him and that neither he nor her friend had ever been to the apartment. She also said that the man who cut Ryan did not look like Cable. Ryan too identified in photographs pieces of duct tape left at the scene after the suspects fled. He testified that the pieces of tape were not there before the break-in and that he did not even have duct tape in his apartment. Ryan said that he did not

know Cable at all.

{¶ 41} Officer Todd Voskuhl testified that, when he arrived at the scene, he saw that the apartment door was splintered open and that the strike plate was on the ground. He then saw blood all over the floor and walls of Ryan's room and Ryan, shaken and scared, holding a blood-soaked towel on his chest, like he was trying to hold his chest muscle in place. Voskuhl photographed the cluttered scene. He did not recall seeing any duct tape at the time, but he identified in his photographs the piece of duct tape that he later found. After the victims left for the hospital with a medic and another police officer, Officer Voskuhl left too, closing the door behind him. Less than an hour later, Voskuhl learned from the other police officer that the victims recalled that the suspects were wearing duct tape on their fingertips. Voskuhl returned to the scene, where he found a bloodied piece of duct tape on the air mattress in Ryan's room. He collected the duct tape and took it back to the police department, where he photographed it, packaged it in a cardboard box, sealed it in an evidence envelope, and placed it in a locked evidence locker accessible only to the officer in charge of the evidence room. Officer Voskuhl completed a lab submission sheet requesting that the Miami Valley Regional Crime Lab test the duct tape for fingerprints and DNA. He said that the lab submission sheet was later modified with a request for DNA testing of another piece of duct tape found at the scene later that day by Detective Weber.

{¶ 42} Officer Jeremy Weber testified that he was working as a detective at the time and was assigned to this case. He arrived at the scene around 10:30 a.m., about seven hours after the crime occurred. Weber found another piece of duct tape in Ryan's bedroom, on the floor next to the wall. Mackenzie told Weber that she and Ryan had

found it on the bed when they returned home from the hospital earlier that morning. Officer Weber collected the piece of duct tape, packaged and sealed it in an evidence envelope, and placed it in an evidence locker with a request for DNA testing. Weber testified that it can take months to get results from the crime lab, so in this case, with no named suspects, no new information, and no solid leads, the investigation lulled while awaiting the DNA test results.

{¶ 43} In the spring of the following year, Officer Weber reviewed the case to see whether there was any new information. He contacted the crime lab and asked them to test the inside of the duct tape (the sticky side) for touch DNA, and he asked the police department's property custodian to bring the duct tape back to the crime lab for this additional testing. A few months later, in early August 2015, Weber was told by the crime lab that there was a hit in the DNA database for Cable. Officer Weber interviewed Cable, who denied committing the crime, denied knowing Ryan, denied entering the apartment, and denied that his DNA could have been left in the apartment. In October, Weber executed a search warrant on Cable for a sample of his DNA, which Weber obtained and sent to the crime lab.

{¶ 44} Latent fingerprint examiner Jennifer Yoak and forensic chemist and serologist Amy Dallaire from the Miami Valley Regional Crime Lab also testified at trial. Yoak testified that she had examined only the piece of duct tape found by Officer Voskuhl (submission 1) for fingerprints and had found none. She said that she had never seen or touched the piece of duct tape found by Officer Weber (submission 2). Dallaire then testified. She talked about DNA generally—what it is, where it is found in the body, and its use in criminal investigations. She also explained the chain-of-custody system in the

crime lab, the measures taken to ensure the security and tracking of evidence in their custody, and the protocols used to prevent contamination. Dallaire testified that two pieces of duct tape were submitted to the crime lab on November 4, 2014. She said that she personally received submission 2. Dallaire saw red-brown staining on the non-sticky side of submission 2 and presumptively tested the stains for blood. After determining that it was blood, she extracted the DNA and concluded that it was Ryan's. Dallaire said that she did no further testing, and in January 2015, submission 2 was returned to the Piqua Police Department.

{¶ 45} According to Dallaire, several months later Detective Weber asked the crime lab about testing the sticky side of submission 2 for touch DNA. The piece of duct tape was resubmitted to the lab, and Dallaire looked for DNA on the sticky side. She found a mixed DNA profile. Running the profiles through the lab's DNA database, Dallaire determined that Ryan was likely the contributor of the minor profile and that Cable was likely the contributor of the major profile. She confirmed that it was Cable's DNA by comparing the major profile with the DNA profile in the sample taken from Cable under the search warrant. They matched. She testified that, using the most conservative estimate, the odds of someone else having the same DNA profile is about one in 19 billion.

{¶ 46} On cross-examination, defense counsel asked Dallaire about the timeline of events, the custody and control of the pieces of duct tape, and her decision not to test the sticky side of the duct tape until the evidence was resubmitted by the Piqua Police Department. No questions were asked about the DNA testing—the actual process of conducting the individual steps of developing a DNA profile; the chemicals, machinery, and techniques used to test DNA; or the statistical analysis and data used to determine

the DNA results and conclusions.

{¶ 47} Finally, Cable's father, Richard Cable, testified for him as an alibi witness. Richard testified that he picked up his son at the Auglaize County Jail on the afternoon of October 27, 2014. He said that they had dinner at Bob Evans, rented a few movies, and watched them together at Richard's Piqua home until 3:30 or 4:00 a.m. the next morning. He said that Cable did not leave the house until about 11:30 a.m.

{¶ 48} The primary issue at trial was whether Cable was the assailant who injured Ryan. Both victims testified that they were not able to identify the perpetrators. Mackenzie testified that she knew Cable and that the perpetrator who hurt Ryan did not look like him. Also, Cable's father provided an alibi, testifying that Cable was with him when the crime was committed and for at least eight hours thereafter. The only evidence that Cable was the assailant was the result of the DNA testing done on the sticky side of the piece of duct tape recovered by Officer Weber from Ryan's bedroom.

{¶ 49} Cable says that witness testimony revealed numerous issues with the collection, handling, and testing of the duct tape. He cites the failure to secure the crime scene for seven hours before the DNA evidence was recovered, inconsistent testimony concerning the total number of pieces of duct tape recovered from the crime scene, that the duct tape from which the DNA was recovered did not have the original lab submission sheet attached at the time of submission to the crime lab, that the duct tape from which the DNA was recovered was transported between the Piqua Police Department property room and the crime lab multiple times, and that a mixed DNA profile was recovered from the duct tape. Cable argues that, given the issues that he raised concerning the handling and testing of the duct tape, there was insufficient evidence to find, beyond a reasonable

doubt, that he was the perpetrator. And Cable argues that the jury clearly lost its way in weighing these concerns about the State's sole evidence linking him to the crime against the testimony establishing his alibi.

{¶ 50} That the victims could not identify Cable as an assailant is not surprising. They testified that the heads and faces of both assailants were covered, leaving only their eyes visible, and that the assailants wore baggy clothing and long-sleeved shirts. The victims also said that the assailants' hands and fingers were covered with duct tape. Officer Weber's testimony clarified that only two pieces of duct tape were found in Ryan's room. Ryan testified that the duct tape was not there before this crime occurred and that he did not own or have any duct tape in his residence. DNA testing of the sticky side of one duct tape piece conclusively established that the DNA found was Cable's. No evidence suggested a plausible alternative explanation for the presence of his DNA on the duct tape found in Ryan's room. The evidence showed that Cable and Ryan were strangers and that, while Cable and Mackenzie knew each other, they had not recently been together. Furthermore, both victims testified that Cable had not been in the apartment previously.

{¶ 51} Cable does not dispute that it was his DNA that was found on the piece of duct tape. Rather, he focuses on alleged problems with the collection, handling, and testing of the duct tape on which his DNA was found. But Cable's allegations are all based on speculation. The evidence did not support finding any problems that would result in Cable's DNA having been inadvertently transferred to the piece of duct tape. The undisputed evidence showed that the piece of duct tape was properly collected, properly sealed, and properly packaged, and no evidence suggested that the tape was

accidentally—or purposefully—contaminated. There was no evidence that the crime lab already had Cable's DNA.

**{¶ 52}** There was conflicting evidence. The DNA test result placed Cable at the scene of the crime, but his father's testimony placed Cable at his father's house. "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). We will not disturb this credibility determination "unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." *Id.* at ¶ 67. Here, the jury did not lose its way because it chose to believe the DNA test result and disbelieve Cable's father's testimony. *Compare id.* at ¶ 69 (saying that "[t]he jury in this case did not los[e] its way simply because it chose to believe the State's witnesses and disbelieve Defendant, which i[t] was entitled to do").

**{¶ 53}** We conclude that there was sufficient evidence in the record on which the jury could rely in finding Cable guilty. Based on the DNA test results, any rational trier of fact could have found that he was one of the assailants who broke into the victims' apartment. We also conclude that the convictions were not against the weight of the evidence. The jury did not lose its way in rejecting Cable's alibi. "This is not the ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *State v. Wilks*, 2018-Ohio-1562, __N.E.3d__, ¶ 169, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Martin*, 20 Ohio App.3d at 175, 175, 485 N.E.2d 717.

**{¶ 54}** The third assignment of error is overruled.

## III. Conclusion

{¶ 55} We have overruled each of the assignments of error presented. The trial court's judgment is therefore affirmed.

. . . . . . . . . . . . .

TUCKER, J., concurs.

DONOVAN, J., concurs in judgment only.

Copies sent to:

Janna L. Parker
Charles M. Blue
Hon. Christopher Gee