**[Cite as *State v. Thompson*, 2020-Ohio-3131.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                               Court of Appeals Nos. L-19-1077
                                                                                        L-19-1244
      Appellee

                                              Trial Court Nos. CR0201803312
v.                                                                                     CR0201803204

 Charles Thompson                                 **DECISION AND JUDGMENT**

      Appellant                                  Decided:  May 29, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Henry Schaefer, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, following a bench trial, defendant-appellant, Charles Thompson, appeals the March 26, 2019 judgments of the Lucas County Court of Common Pleas, convicting him of aggravated burglary and rape, and sentencing him to a total prison term of 20 years.  For the following reasons, we affirm the trial court judgments.

# I. Background

{¶ 2} On December 11, 2018, Charles Thompson was indicted in Lucas County case No. CR0201803204 on one count of aggravated burglary, a violation of R.C. 2911.11(A)(1) and (B). On December 31, 2018, he was indicted in Lucas County case No. CR0201803312 on one count of rape, a violation of R.C. 2907.02(A)(2) and (B). The state filed a motion for joinder of the offenses, which the trial court granted.

{¶ 3} On March 5, 2019, Thompson executed a waiver of jury trial, and the case was tried to the bench that day. The trial judge announced his verdict on March 11, 2019. He found Thompson guilty of both offenses and sentenced him to ten years' imprisonment on each conviction, to be served consecutively. He imposed a mandatory period of five years' postrelease control and found Thompson to be a Tier III sex offender.

{¶ 4} Thompson appealed. He assigns the following errors for our review:

> I. APPELLANT'S CONVICTION IS UNSUPPORTED BY SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO STRIKE SURPLUSAGE.
>
> III. THE TRIAL COURT ERRED IN FAILING TO MERGE THE OFFENSES AT SENTENCING.

## II. Law and Analysis

{¶ 5} In his first assignment of error, Thompson challenges both the weight and the sufficiency of the evidence. In his second and third assignments of error, respectively, he claims that the trial court erred in granting the state's motion to strike surplusage from the indictment and in failing to merge his convictions at sentencing. We consider each of these assignments in turn.

### A. Sufficiency and Weight of the Evidence

{¶ 6} In his first assignment of error, Thompson argues that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. Before addressing Thompson's specific challenges, we summarize the facts as they were presented at trial.

### 1. The Evidence at Trial

{¶ 7} Sixty-four-year-old M.B. was living in an apartment in Maumee, Ohio, with her Maltese dog. On the evening of August 13, 2018, before she went to bed, M.B. locked the doors and left the living room light on, as was her habit. She fell asleep in her bedroom watching television, but was awoken when her dog started growling and barking. M.B. left her bedroom, and as she walked down the hallway, she saw the living room light go off. A man put a towel over her face and pushed her into the bathroom.

{¶ 8} The man raped M.B. in the bathroom, both vaginally and anally. He used his fingers and his penis. He then put soap and hot water on the towel and wiped down M.B.'s vagina. M.B. started to pray the Lord's Prayer out loud and the man began to

3.

recite it with her. M.B. reprimanded him and asked him what his mother would think if she knew what he was doing.

{¶ 9} The man commanded M.B. into the bedroom. M.B. had suffered multiple strokes and had trouble standing up unassisted, so the man dragged her across the carpet into the bedroom, causing her knees to bleed. He put M.B. on the bed and covered her face with the mattress pad. Again he raped her vaginally and anally, digitally and with his penis. He finished, then left the room. M.B. does not know if the man ejaculated.

{¶ 10} When all was quiet, M.B. left her bedroom and walked into the living room. She could see through the sun porch off the living room that the man was coming back. She grabbed her phone and hurried outside. The man ran away from her apartment through the parking lot. M.B. noticed that the screen to the door on the sun porch had been cut out.

{¶ 11} M.B. called 9-1-1 at 12:43 a.m. on August 14, 2018. She was transported by ambulance to the University of Toledo Medical Center where she was examined by a sexual assault nurse examiner ("SANE nurse"). A rape kit was performed and photos of her injuries were taken. There were abrasions on her hands, wrists, and elbows; redness on her neck and back; redness on the back of her neck, possibly from the necklace she was wearing; and bilateral knee abrasions and lacerations. There was also an abrasion on her vagina, at the six o'clock position, early stages of a bruise at the seven o'clock position, and redness to the surrounding skin. The SANE nurse swabbed M.B.'s vagina; there was fresh blood on the swabs.

4.

{¶ 12} M.B. was wearing only a t-shirt when she arrived at the hospital; that t-shirt was sent to the Ohio Bureau of Criminal Investigation ("BCI"), along with specimens collected as part of the rape kit, including vaginal and anal swabs and pubic hair combings.

{¶ 13} The BCI identified no DNA profile foreign to M.B. in either the vaginal or anal specimens that it tested. Pubic hair combings revealed male DNA but the sample was too small to identify the contributor. The t-shirt was negative for the presence of semen or bodily fluid, but touch DNA was found on the t-shirt that matched Thompson's DNA profile. The frequency for the occurrence of the DNA profile taken from the t-shirt was quantified as one in 20 billion.

{¶ 14} In addition to identifying Thompson's DNA on M.B.'s t-shirt, his cell phone records were obtained. Detective William Hunt of the Sylvania Township Police Department analyzed 32 days of cellular phone data. Detective Hunt explained that location data was available for 1,312 voice calls made from or received by the phone during that period—location information was not available for text messaging. This location data revealed that on the evening of August 13, 2018, Thompson's cell phone accessed the cell phone tower visible from M.B.'s apartment complex at 9:36 p.m. and 9:53 p.m. It accessed a tower visible from his own residence on Hill Avenue on August 14, 2018, at 1:24 a.m.; Thompson's residence is about a 12-minute drive from M.B.'s apartment. There was no activity on Thompson's phone at all—voice calls or messaging—between 10:08 p.m. on August 13, 2018, and 12:59 a.m. on August 14,

5.

2018. Over the 32-day period studied by Detective Hunt, Thompson's cell phone accessed the cell phone tower near M.B.'s apartment only four times—two of those times were August 13, 2018, the night M.B. was raped. The other two times were on August 6, 2018.

{¶ 15} A log of Thompson's jailhouse phone calls was admitted into evidence and discussed at trial. The log showed that two phone numbers frequently dialed by Thompson from the jail were the same two phone numbers from which his phone received calls on August 13, 2018. The state suggested that because these were numbers that Thompson frequently dialed, it may be inferred that he was in possession of his phone on August 13, 2018.

{¶ 16} M.B. was shown a photo array of possible suspects on October 17, 2018. She identified her attacker as someone other than Thompson. M.B. testified that she wears glasses, but she was not wearing her glasses at the time of her attack. Additionally, for much of her attack, a towel or mattress pad was covering her face. M.B. also described that there was only a nightlight on in the bathroom, and the TV provided the only source of light in her bedroom.

## 2. Sufficiency of the Evidence

{¶ 17} We begin by addressing Thompson's challenge to the sufficiency of the evidence. Thompson argues that the state's case lacked sufficient evidence because (1) M.B. did not testify that it was he who raped her; (2) she identified someone else; (3) his DNA was not found in any place consistent with sexual assault; (4) the only

6.

evidence linking him to the crime is DNA on the t-shirt, but there was no evidence as to when or where M.B. purchased the t-shirt or when it was last laundered. Thompson submits that touch DNA could have been transferred to the t-shirt if he and the victim had brushed up against one another at a grocery store, and given that there was no evidence placing him in M.B.'s apartment, no rational trier of fact could have found him guilty of rape.

{¶ 18} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 19} As to Thompson's rape conviction, under R.C. 2907.02(A)(2), "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The state presented testimony from M.B.—substantiated by the SANE nurse—indicating that M.B. was purposely compelled by force to engage in sexual conduct. Thompson's challenge to the sufficiency of the evidence focuses on his identity as the perpetrator of M.B.'s rape.

7.

{¶ 20} Ohio courts recognize that the identity of the perpetrator of an offense may be established by either direct or circumstantial evidence. *State v. Littlejohn*, 8th Dist. Cuyahoga No. 101549, 2015-Ohio-875, ¶ 37; *State v. Golden*, 8th Dist. Cuyahoga No. 88651, 2007-Ohio-3536, ¶ 16 ("Courts have repeatedly recognized that identification can be proved by circumstantial evidence."); *State v. Golston*, 9th Dist. Summit No. 22154, 2005-Ohio-8, ¶ 17 (explaining that defendant's identity as perpetrator of offense may be proven by direct or circumstantial evidence). "Circumstantial evidence and direct evidence inherently possess the same probative value * * *." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-55, 529 N.E.2d 1236 (1988). Circumstantial evidence is sufficient to uphold a conviction so long as the inferences to be drawn from the surrounding facts in evidence are not so weak or attenuated that no reasonable mind could find guilt beyond a reasonable doubt. *State v. Willis*, 6th Dist. Wood No. WD-88-38, 1989 WL 90636, * 4 (Aug. 11, 1989).

{¶ 21} It is not uncommon that a victim is unable to identify his or her attacker. This is especially true when the assailant wears a mask to conceal his or her identity or places something over the victim's head. *See State v. Cable*, 2d Dist. Miami No. 2017-CA-23, 2018-Ohio-3923, ¶ 50 (noting that it was not surprising that victims could not identify assailants who had covered their heads and faces). Here, the state offered the following circumstantial evidence of Thompson's identity as M.B.'s rapist: (1) that

8.

Thompson's DNA was found on M.B.'s t-shirt; and (2) that contrary to his typical pattern of cell phone usage, Thompson used his cell phone near M.B.'s home shortly before her attack.

{¶ 22} Courts have found that this type of evidence is sufficient to establish the defendant's identity as the perpetrator of an offense. *See, e.g., State v. Bandy*, 7th Dist. Mahoning No. 05-MA-49, 2007-Ohio-859, ¶ 85 ("Despite the fact that Stephanie was unable to identify appellant, the DNA evidence alone overwhelmingly supported the conclusion that appellant was Stephanie's attacker."); *State v. Cable*, 2d Dist. Miami No. 2017-CA-23, 2018-Ohio-3923, ¶ 53 (concluding that rational trier of fact could have found that defendant was assailant based on DNA test results, despite defendant's father's testimony that defendant was at his house at time of crime); *State v. Kelly*, 5th Dist. Delaware No. 17 CAA 04 0023, 2018-Ohio-378, 105 N.E.3d 527, ¶ 86 (rejecting sufficiency and weight challenges where, among other things, cell phone tower data was presented placing appellant and codefendants together in Delaware County); *State v. Seymour*, 5th Dist. Richland No. 03-CA-37, 2004-Ohio-3835, ¶ 61 (finding sufficient evidence that defendant killed victim where her cell phone placed call that originated from the area where the victim's body was found, DNA of defendant and victim were found on cigarette butt, and defendant made incriminating statements).

{¶ 23} While it is true that M.B. identified someone else when presented with a photo array months after her rape, this goes to the weight of the evidence, not its sufficiency. So too do Thompson's possible explanations for why his DNA was found on

9.

the victim's t-shirt.[1] We find that the state presented sufficient evidence to support Thompson's rape conviction.

As to Thompson's aggravated burglary conviction, R.C. 2911.11(A)(2) provides that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another * * *."

{¶ 24} M.B. testified that a man intruded into her apartment and repeatedly raped her, and the SANE nurse testified that the physical evidence was consistent with M.B.'s claim. The state presented evidence that the screen door to the sun porch had been cut out. While there was no evidence that the slider door had been tampered with, Ohio law is clear that the force element of an aggravated burglary charge may be established by evidence that the defendant entered the victim's home by opening a closed but unlocked door. *State v. Primous*, 8th Dist. Cuyahoga No. 108341, 2020-Ohio-912, ¶ 29. We find that the state presented sufficient evidence to support Thompson's aggravated burglary conviction.

### 3. Weight of the Evidence

{¶ 25} We next turn to Thompson's challenge to the weight of the evidence. Thompson argues that the evidence in the case overwhelmingly weighs against his

---

[1] We would point out, however, that contrary to Thompson's argument, the victim did state where she got the t-shirt. She said that she bought it from her church.

conviction. He points out that M.B. testified that she locked the door before going to bed, but her assailant entered without forcing the door open or damaging it. He maintains that M.B.'s testimony suggests either that her memory was faulty or that she invited her assailant into the apartment. He insists that this raises doubt as to whether the sexual conduct was consensual and defeats the trespass element of the aggravated burglary conviction.

{¶ 26} Thompson also contends that M.B. identified someone else as her assailant and the state presented no evidence why law enforcement suspected him in the first place. He argues that the state leaps from evidence that Thompson at some point touched M.B.'s t-shirt to the conclusion that he raped her. He contends that this is the exceptional case requiring reversal on manifest-weight grounds.

{¶ 27} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the

11.

conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 28} We acknowledge that M.B. was shown a photo array, identified her rapist as someone other than Thompson, and was never able to identify Thompson as her attacker. But M.B. testified that her assailant put a towel over her head, then a mattress pad, she did not have her glasses on, and the rooms where the attack took place were poorly lit. A rational trier of fact could have concluded that these factors caused M.B. to misidentify her attacker. *See, e.g., State v. Strowder*, 8th Dist. Cuyahoga No. 105569, 2018-Ohio-1292, ¶ 34 (rejecting appellant's manifest weight argument even though victim misidentified other individuals as her assailants in two separate photo arrays).

{¶ 29} A rational trier of fact could also have concluded that Thompson was the perpetrator based on the presence of his DNA on the t-shirt M.B. was wearing. This conclusion is strengthened by the fact that Thompson's cell phone accessed the tower near M.B.'s home just before the attack, even though his cell phone had accessed this tower only four times (out of 1,312 phone calls) in a period of 32 days.

{¶ 30} As to the fact that the slider door was not damaged, a rational trier of fact could reasonably have concluded that M.B. was mistaken in recalling that she locked the door or that her attacker was able to gain access by manipulating the lock without damaging it. It was reasonable for the trier of fact to reject any suggestion that M.B. engaged in consensual sexual conduct, particularly given M.B.'s testimony to the contrary and the evidence of the injuries she suffered.

12.

{¶ 31} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the fact-finder's credibility determinations given that it is the fact-finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Here we find that the trial judge did not clearly lose his way in resolving evidentiary conflicts adverse to Thompson. This is not the exceptional case requiring reversal.

{¶ 32} We find Thompson's first assignment of error not well-taken.

### B. Motion to Strike Surplusage

{¶ 33} On February 28, 2019, the state moved under Crim.R. 7(C) to strike surplusage from the indictment. Specifically, it sought to strike the mens rea of "knowingly" that was contained in the indictment, when the requisite mens rea under R.C. 2907.02(A)(2) is "purposely." Thompson filed no opposition to the state's motion. The trial court granted the motion on March 7, 2019. Thompson now argues that the trial court erred in granting the motion.

{¶ 34} Generally, we review a trial court's decision to permit the amendment of an indictment under an abuse-of-discretion standard. *State v. Stuckman*, 6th Dist. Sandusky No. S-17-039, 2018-Ohio-4050, ¶ 52. Because he failed to object, however, Thompson has forfeited all but plain error. *State v. Shockey*, 2019-Ohio-2417, 139 N.E.3d 486, ¶ 7 (9th Dist.). Plain error is error that affects substantial rights. Crim.R. 52(B). In

13.

determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 35} "The court on motion of the defendant or the prosecuting attorney may strike surplusage from the indictment or information." Crim.R. 7(C). Additionally, under Crim.R. 7(D), "[t]he court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."

{¶ 36} Here, the indictment provided as follows:

**CHARLES THOMPSON**, on or about the 13TH day of AUGUST, 2018, in Lucas County, Ohio, did knowingly engage in sexual conduct with another when the offender purposely compelled the other to submit by force or threat of force, in violation of **§ 2907.02(A)(2) and (B) OF THE OHIO REVISED CODE, RAPE, BEING A FELONY OF THE FIRST DEGREE PUNISHABLE PURSUANT TO § 2907.02(B)** * * *.

The indictment identified the correct statute and the amendment requested by the state did not change the name or identity of the crime charged.

{¶ 37} The Ninth District considered a similar issue in *State v. Yockey*, 9th Dist. Wayne No. C.A. 2257, 1987 WL 16914, *2 (Sept. 9, 1987). In *Yockey*, the indictment listed "purposely/knowingly" as the culpable mental state, instead of "purposely," as is provided in R.C. 2907.02(A)(2). The trial court allowed the indictment to be amended to strike the word "knowingly." The appellate court affirmed. It held that "the word 'knowingly' was mere surplusage, * * * [t]he indictment was sufficient to inform the defendant of the charges against him[,] * * * [and] deletion of the word 'knowingly' changed neither the name nor the identity of the crime charged." *Id.* at *2.

{¶ 38} We reach the same conclusion here. The trial court neither abused its discretion nor committed plain error in granting the state's motion to strike the word "knowingly" from the indictment.

{¶ 39} We find Thompson's second assignment of error not well-taken.

### C. Merger

{¶ 40} In his third assignment of error, Thompson argues that the trial court erred in failing to merge the rape and aggravated burglary convictions at sentencing. He argues that aside from the rape of which he was convicted, there was "no separate harm to the victim stemming from the burglary." Accordingly, he claims, "the offenses are not of dissimilar import" and they should have merged at sentencing.

15.

{¶ 41} The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the state through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. The Double Jeopardy Clause protects against a number of abuses. *Id.* Pertinent to this case is the protection against multiple punishments for the same offense. *Id.* To that end, the General Assembly enacted R.C. 2941.25, which directs when multiple punishments may be imposed. *Id.* It prohibits multiple convictions for allied offenses of similar import arising out of the same conduct:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 42} In *Ruff*, the Ohio Supreme Court examined in detail the analysis that must be performed in determining whether offenses are allied offenses of similar import under R.C. 2941.25. It identified three questions that must be asked: "(1) Were the offenses

dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?" *Id.* at ¶ 31. If the answer to any of these questions is "yes," the defendant may be convicted and sentenced for multiple offenses. *Id.* at ¶ 25, 30. The court explained that offenses are of *dissimilar* import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. It emphasized that the analysis must focus on the defendant's conduct, rather than simply compare the elements of two offenses. *Id.* at ¶ 30.

{¶ 43} Thompson contends that "there are no other acts of rape other than that for which Appellant was found guilty." This is an inaccurate characterization of the evidence. While it is true that Thompson was charged with and convicted of only one count of rape here, the victim testified to multiple instances of rape. The victim testified at trial that Thompson raped her vaginally and anally in the bathroom, dragged her into the bedroom, and raped her again. He inserted both his fingers and his penis into her vagina and anus. Ohio law is clear that each of these acts of rape, if charged, would support a separate count of rape and multiple rape counts do not merge. *See, e.g.*, *State v. Barnes*, 68 Ohio St.2d 13, 14-15, 427 N.E.2d 517 (1981); *State v. Trevino*, 6th Dist. Erie No. E-13-042, 2014-Ohio-3363 ¶ 15-16. The issue here is whether the uncharged acts of rape may be considered in a merger analysis.

{¶ 44} In *State v. Greely*, 6th Dist. Lucas No. L-16-1161, 2017-Ohio-4469, we found that separate and identifiable harm resulted from the aggravated burglary where the

17.

victim had been raped multiple times, even though each rape was not charged as separate crimes. The defendant in *Greeley* argued that because he was convicted of only one rape, all of the additional acts of rape should be ignored because "uncharged conduct" cannot be considered in a merger analysis under R.C. 2941.25(B).

{¶ 45} As explained in the concurring opinion in *Greeley,* a conviction for aggravated burglary under R.C. 2911.11(A)(1) requires that in addition to breaking into an occupied structure with the intent to commit any criminal offense, "the offender inflicts, or attempts or threatens to inflict physical harm on another." The statute does not require, however, that the "physical harm" element of aggravated burglary result in a separately-charged criminal offense.

{¶ 46} As in *Greeley,* regardless of which singular act of rape underlies Thompson's rape conviction, the aggravated burglary resulted in harm that is separate and identifiable from the harm of the rape offense—i.e., the aggravated burglary resulted in multiple other rapes against the same victim. It is immaterial that those additional rapes could have been, but were not, charged as separate crimes. Because the additional rapes resulted in separate and identifiable harm, Thompson's rape and aggravated burglary convictions are offenses of dissimilar import under R.C. 2941.25(B) and were not subject to merger.

{¶ 47} We find Thompson's third assignment of error not well-taken.

18.

### III. Conclusion

{¶ 48} Thompson's convictions for rape and aggravated burglary were not against the sufficiency or weight of the evidence. Even though the victim identified someone else in a photo array, a rational trier of fact could have concluded that Thompson was the perpetrator of the crimes based on the presence of his DNA on the victim's t-shirt and the location data generated by his cell phone. Additionally, regardless of whether the victim correctly recalled locking the sliding door to her sun porch, the force element of an aggravated burglary charge may be established by evidence that the defendant entered the victim's home by opening a closed but unlocked door. We find Thompson's first assignment of error not well-taken.

{¶ 49} The trial court neither abused its discretion nor committed plain error in granting the state's motion to strike the word "knowingly" from the indictment for rape. The word "knowingly" was mere surplusage, the indictment sufficiently informed Thompson of the charges against him, and deletion of the word did not change the name or the identity of the crime charged. We find Thompson's second assignment of error not well-taken.

{¶ 50} The trial court properly refused to merge Thompson's rape and aggravated burglary convictions at sentencing. While Thompson was convicted of only one count of rape, there were multiple additional rapes committed during the burglary that could have been, but were not, charged as separate crimes. Those additional rapes constituted

19.

separate and identifiable harm for purposes of the merger analysis. We find Thompson's third assignment of error not well-taken.

{¶ 51} We affirm the March 26, 2019 judgments of the Lucas County Court of Common Pleas. Thompson is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.